ATLAS TRADING CORPORATION v. S. H. GROSSMAN, Inc.

No. 9550.

Circuit Court of Appeals.

Third Circuit.

Argued April 9, 1948.

Decided July 29, 1948.

Frederic M. P. Pearse, of Newark, N. J., for appellant.

Myron Kommel, of New York City (Samuel J. Kaufman, of Newark, N. J., on the brief), for appellee.

Before GOODRICH, McLAUGHLIN and O'CONNELL, Circuit Judges.

O'CONNELL, Circuit Judge.

The complaint of plaintiff, a New York corporation whose business included the sale of motor vehicles for export, asserts that defendant, a New Jersey corporation selling motor vehicles, committed a breach of contract. From a judgment entered on a jury verdict awarding plaintiff the sum of $9500, defendant has taken the instant appeal.

A somewhat detailed chronological recital of the principal events leading to the filing of the complaint is important for an understanding of the issues which defendant here raises.

(1) On February 28, 1942, the War Production Board promulgated General Conservation Order M-100. Neither litigant challenges the validity or applicability of the order, pertinent parts of which (a) forbade the transfer of any new commercial motor vehicle, except to a person holding a Government Exemption Permit (hereinafter called "Permit"), and (b) regardless of any inconsistent arrangement, required that, when a Permit was presented to a sales agency having in stock a vehicle of the type specified, the sales agency was to transfer such vehicle to the person named in the Permit.

(2) In the summer of 1942, plaintiff purchased from Dexter Motors, Inc. (hereinafter called "Dexter"), a sales organization, ten Dodge WH-47 two-ton trucks which Dexter had in stock. Plaintiff supplied the Permits.

(3) In August, 1942, plaintiff approached Dexter for twenty more trucks of similar type. Having only eight such trucks in stock, Dexter contacted defendant. The Dexter representative avers, and defendant denies, that defendant at that time was told that plaintiff was selling the trucks to the Free French Delegation. Defendant did supply at least twelve of the trucks which plaintiff wanted. Defendant paid Dexter for the part which Dexter played in the transaction. Plaintiff again furnished the Permits.

(4) On September 30, 1942, pursuant to oral negotiations, Dexter and defendant each sent plaintiff a letter. The Dexter letter stated in part, " * * * we are offering you the following 32 Dodge WH47 Trucks firm until next Tuesday, Oct. 6th." The letter of defendant, indicating that the

information it contained was submitted in connection with this transaction, listed the serial and motor numbers of thirty-one such trucks, and reminded plaintiff that a Permit was a prerequisite to release of the trucks.

(5) On October 6, 1942, plaintiff sent Dexter a letter in which, "subject only to receipt of the necessary releases from the U. S. Government we are ordering firm as per your letter to us under date of September 30th, 1942" the thirty-two trucks at the prices quoted in the Dexter September 30 letter. This October 6 letter added that a letter of credit would be established as soon as the Permits were received, and that plaintiff was to have the right to substitute other tire sizes "if our clients so require us." The letter closed with the request that, on the duplicate, Dexter sign acceptance and defendant "countersign." Dexter and defendant did sign the duplicate.

(6) On October 27, 1942, defendant sent plaintiff a letter, which in part reads as follows: "This letter cancels and supersedes our letter to you dated September 30th with reference to these same units. In accordance with our conversation of today, we are listing below the serial and motor numbers of these units * * *." All twenty-five trucks listed also appeared in the September 30 letter of defendant. The price per unit, $1530, was the same as that quoted in the September 30 letter of Dexter. Repeated verbatim in the October 27 letter was the paragraph reminding plaintiff of the necessity of a Permit.

(7) On November 17, 1942, the Free French Delegation requisitioned twenty-five such trucks and spare parts in the amount of 15% of the value of the trucks. The requisition included the comment that plaintiff was thought to be able to meet the delivery requirements.

(8) On November 18, 1942, defendant sent an invoice for the twenty trucks for which plaintiff had contracted in August. On the invoice, the printed words "Sold to" are followed by the typed words "Atlas Trading Corporation," and there is this notation: "Contact [sic] #D. A.-T. P. S.-15288."

(9) On November 25, 1942, the British Ministry of Supply Mission, through which the Free French were purchasing, advised plaintiff that a "proposal for quotation from the Treasury Procurement Division" of the United States "should be forthcoming very shortly." The Dexter representative testified that, in explanation of the delay, he showed this letter to defendant.

(10) On December 3, 1942, plaintiff sent defendant a letter enclosing "lists of spare parts for Contracts A and B." Defendant, inter alia, was asked to check the prices on these lists, with consideration being given that the items be "properly packed for export."

(11) On December 14, 1942, defendant by letter to plaintiff, after referring to the "list of spare parts for Contracts A and B," called attention to several changes in unit prices, and spoke of adjusting the quantity of certain items "in order that the total may equal the dollar volume as ordered."

(12) Two days later, in accordance with a telephone conversation with plaintiff, defendant by letter to plaintiff enclosed the list "for Contracts A and B for the United States Treasury," which list plaintiff had forwarded in the December 3 letter.

(13) On December 17, 1942, the Treasury Procurement Division solicited from thirteen persons bids to sell twenty-five WH-47 two-ton Dodge trucks, together with spare parts in the amount of 15% of the value of the trucks. The specifications for these trucks were the same as those noted in the Dexter September 30 letter. The file reference on this Treasury letter was "DA-attention J. W. Flatley." The letter stated that Permits would be furnished the successful bidder.

(14) On December 21, 1942, plaintiff submitted a bid of $1989 per truck, boxed for export, plus spare parts in the amount of approximately 15%. This bid, $100 per truck less than that specified in Contract #D. A.-T. P. S.-15288 (the earlier contract for the twenty trucks), stated that the trucks were available for immediate delivery. Plaintiff at that time had in stock no such trucks, which were undeniably scarce.

(15) On the same day, a subsidiary of the Chrysler Corporation forwarded to defendant the Treasury invitation for bids.

(16) On December 26, 1942, defendant, referring to the invitation sent the Chrysler subsidiary, submitted a bid of $1515.46 per truck, plus $160 per truck for boxing, besides spare parts in the amount of 15%. This bid included the statements, "Delivery of the trucks can be made within two weeks after receipt of your order. * * * These quotations are made subject to prior sale." The testimony was that the only trucks owned by defendant and meeting the specifications of the Treasury were those listed in the previous letters of defendant to plaintiff.

(17) The Treasury Department received only one other bid, from a Boston concern asking $2231.82 per truck.

(18) On January 4, 1943, the Treasury Department awarded its contract to defendant, the low bidder.

(19) On January 7, 1943, plaintiff by telegram notified defendant that plaintiff expected defendant "to honor your contract for the delivery of 25 WH 47 Dodge trucks."

(20) On January 9, 1943, in a letter to the Treasury Procurement Division, defendant requested "permission to withdraw our quotation to you and the cancellation of your acceptance," because defendant "had submitted a quotation to a private concern prior to the submission of our quotation to you."

(21) Two days later, the Treasury Procurement Division denied this request.

(22) One day thereafter, defendant signed a confirmation of the quotation it had made to the Treasury.

(23) On January 18, 1943, defendant by letter to plaintiff withdrew the October 27 and all previous "quotations" to plaintiff, the assigned reason being that plaintiff had failed to furnish defendant with the Permits, whereas the Treasury had done so.

(24) On February 1, 1943, the Treasury sent defendant a copy of the bid contract, which the Treasury had accepted two days before.

The complaint sub judice was filed on May 21, 1943. The case has been removed from the calendar six times, and there has been one mistrial. The trial leading to the appeal at bar was marked by vigorous and intermittent objections by defendant. In his charge to the jury, the trial court took the position that the contract, if any, between plaintiff and defendant, was a parol agreement; that it was for the jury to decide whether the letters and testimony outlined above showed an intent of the parties to bind one another; and that the jury was likewise to determine whether defendant deliberately did something, such as submitting a bid to the Treasury, which prevented plaintiff from obtaining the Permits. As we have stated above, the jury returned its verdict in favor of plaintiff.

On this appeal, defendant raises the following questions: (a) whether there was an enforceable contract between plaintiff and defendant; (b) whether the trial court committed reversible error in admitting certain testimony and exhibits; (c) whether there was prejudicial error in the charge to the jury; and (d) whether the jury verdict was in accordance with the evidence. Full weight, of course, must be given the jury verdict and all inferences issuing therefrom.

 Federal jurisdiction in this case stems from diversity of citizenship. The situs of the district court being New Jersey, the law to be here applied is of that state, including its rules on conflict of laws. Klaxon Co. v. Stentor Electric Mfg. Co., 1941, 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477.

 We must first decide, therefore, whether, in the light of the jury verdict, New Jersey courts would hold that defendant had contracted to sell the trucks to plaintiff. We think they would.

The dealings between the parties prior to September 30, 1942, are not without value in casting light upon what transpired subsequently. It seems fairly clear that trucks such as those here involved were by no means plentiful in the latter part of 1942. Since both plaintiff and defendant were aware that Dexter could not provide twenty trucks from its own stock only shortly be-

fore September 30, they doubtless consider-
ed Dexter thereafter as intermediary for
transfer of the trucks from defendant to
plaintiff. The evidence lends further sup-
port to this conclusion: (a) defendant
billed plaintiff, rather than Dexter, for the
twenty trucks; (b) defendant paid Dexter
for the part which Dexter played in the
sale of the twenty trucks;[1] and (c) as to
the negotiations forming the basis of the
instant complaint, defendant by letter com-
municated directly with plaintiff on at least
five occasions.

Consequently, when Dexter, alluding to a
discussion with plaintiff, offered to sell
thirty-two trucks on September 30, 1942;
and when on the same day defendant, re-
ferring to these same negotiations, sent
plaintiff a list of trucks; we think it was
entirely reasonable for plaintiff and the
jury to infer that an agency relationship
of some kind, formal or otherwise, existed
between Dexter and defendant, and that the
offer of Dexter was made on behalf of de-
fendant. See Restatement, Agency, § 27.

■ The October 6 letter of plaintiff,
which bears the signature of Dexter and
defendant as well, stated that plaintiff was
"ordering firm as per your letter to us" the
thirty-two trucks. Assuredly New Jersey
courts would not say as a matter of law
that such language does not constitute an
acceptance; and even if it were argued
that subsequent provisions of this letter
rendered the acceptance other than unquali-
fied, or that Dexter lacked the power to
bind defendant to such a sale, the fact that

both Dexter and defendant subsequently
signed the letter was ample ground for de-
termining that defendant entered into a
contract with plaintiff.[2] Under the terms
of this letter, plaintiff promised to buy from
defendant thirty-two trucks—no more, no
less—when plaintiff secured the Permits;
and defendant promised to sell plaintiff
thirty-two trucks, thirty-one of which were
identified by motor and serial number.

■■ As will be indicated hereafter, the
trucks were to be delivered in Newark, N.
J. The final act in consummating the con-
tract was apparently the so-called counter-
signature of defendant, presumably in New
Jersey. See 1 Williston on Contracts (1936)
97. In the absence of any clear indication
that the parties intended the law of New
York to govern the transaction, therefore,
New Jersey would apply its own law in in-
terpreting the contract. See Shotwell v.
Dairymen's League Cooperative Ass'n, 1944,
37 A.2d 420, 422, 22 N.J.Misc. 171, 174; and
see Restatement, Conflict of Laws, §§ 311
and 326, and 6 Williston on Contracts (1936)
§ 1792. In any event, however, New York
courts would hold defendant to the same
standard of conduct as would New Jersey;
viz., just as plaintiff could avoid its obliga-
tion only by a bona fide failure to secure the
Permits within the time contemplated by
the agreement,[3] defendant had the duty of
taking no action which would prevent plain-
tiff from obtaining the permits. See Atlan-
tic City v. Farmers' Supply & Products Co.,
1921, 96 N.J.L. 504, 507, 115 A. 388, 389,
and Vanadium Corporation of America v.
Fidelity & Deposit Co., 2 Cir., 1947, 159 F.

[1] Dexter has received no remuneration in connection with the twenty-five trucks here in question.

[2] Defendant suggests that its signature was described as a countersignature, rather than as an acceptance, in the letter itself. To apply here a technical mean-ing to the word "countersign," however, is to invite an absurd result. There cer-tainly was no need for defendant to at-test the authenticity of the Dexter signa-ture; nor was Dexter the superior of defendant. See Empire Rubber Mfg. Co. v. Morris, 1906, 73 N.J.L. 602, 610, 65 A. 450, 454, and Mantell v. International Plastic Harmonica Corporation, 1947, 141 N.J.Eq. 379, 55 A.2d 250, 255 173 A.L.R. 1185; and see Restatement, Contracts, §

235. At best, what was intended would be a jury question which the verdict has resolved in favor of plaintiff.

[3] None of the documents indicate what deadline, if any, for obtaining the permits was set. We do know, however, that the delay in consummating the purchase was indicated to defendant when the November 25 letter of the British Ministry of Sup-ply Mission was received; that the De-cember 14 and December 16 letters of de-fendant indicate that the deadline for per-formance had not elapsed; that defend-ant recognized an obligation to plaintiff in the January 9 letter to the Treasury; and that defendant did not advise plaintiff of a purported revocation until January 18.

2d 105, 108; and see Restatement, Contracts (1932) § 295.

██ This brings us to a consideration of the effect of the October 27 letter of defendant. Its language purports to cancel and supersede the October 6 contract, "in accordance with our conversation of today." Whether in fact what plaintiff and defendant intended was a cancellation of their previous contract, or whether the statement was merely an inartistic mode of effecting a reformation of the previous contract,[4] was a question properly and clearly left for the jury in the charge of the court below. The jury chose to believe that plaintiff and defendant undertook very similar obligations to those outlined in the letters of September 30 and October 6, the principal difference being that the number of trucks was reduced from thirty-two to twenty-five. Moreover, by saying that the October 27 bargain was "in accordance with our conversation of today," defendant itself opened the door to oral testimony concerning the agreement which prompted that letter. It is not inapposite to note further that the October 27 letter is still another indication of the apparent consent of defendant to the terms stipulated in the Dexter September 30 letter. We think the jury had ample warrant for the finding that plaintiff and defendant, on and after October 27, did have a binding contract.

██ This brings us to the consideration of whether defendant committed a breach of that contract. The record is replete with evidence from which the jury could find that defendant deliberately submitted a bid which defendant knew, or should have known, was likely to prevent plaintiff from obtaining the Permits. We cite the following: (a) The testimony that defendant was told, in connection with the twenty-truck transaction, that the Free French Delegation was buying the trucks; (b) the November 18 invoice specifying a Treasury contract number; (c) the fact that plaintiff sought thirty-two (later reduced to twenty-five) trucks of similar type; (d) the testimony that the November 25 letter of the British Ministry of Supply, advising of a forthcoming proposal from the Treasury, was shown to defendant; (e) the correspondence between plaintiff and defendant concerning the spare parts, from which the jury could infer that defendant knew not only the connection between the spare parts and the trucks, but also the identity of the purchaser and the destination of the equipment; (f) the fact that the specifications of the Treasury solicitation for bids were identical, both as to quantity and as to special equipment, to those set forth in the Dexter September 30 letter; (g) other similarities inviting comparison, such as that the file reference of this Treasury letter contained the same initial letters, "DA", as those used in the twenty-truck transaction, and that the Treasury, like plaintiff, wanted spare parts in the same percentage; (h) the absence of testimony that defendant was required to make a bid, and the indication that defendant learned of the Treasury solicitation only through the communication from the Chrysler subsidiary; (i) the fact that the bid of defendant, being even lower than the price plaintiff would have to pay defendant, was one which plaintiff was hardly likely to meet; (j) the testimony indicating that, owing to the scarcity of trucks, defendant was not apt to fulfill its promise of delivery within two weeks unless the trucks listed in the October 27 letter were diverted; (k) the notation in the bid of defendant that its quotations were "subject to prior sale"; (l) the attempt of defendant to withdraw shortly after plaintiff notified defendant that plaintiff expected honoring of its contract; and (m) the fact that the trucks which defendant did sell to the Treasury were those listed in the October 27 letter.[5] The evidence overwhelmingly supports the jury finding that defendant deliberately not only prevented plaintiff from obtaining the Permits, but also, by selling the trucks to a third party, disabled itself from performing

---

[4] New Jersey, of course, permits contracting parties by mutual consent to alter contracts such as that here involved. See Troth v. Millville Bottle Works, 1916, 89 N.J.L. 219, 221, 98 A. 435, 436.

[5] It is interesting to note that the January 7 confirmation to the Treasury lists the serial and motor numbers in precisely the same order as that in the October 27 letter to plaintiff.

such contract in the future. See Internal Water Heater Co. v. Burns Bros., 1935, 114 N.J.L. 368, 373, 176 A. 380, 382, and Restatement, Contracts (1932) § 315.

The record, therefore, supports the finding that defendant committed a breach of a valid contract to sell the twenty-five trucks to plaintiff.

▮ In general, the evidence which defendant here urges should have been excluded in the court below may be classified principally as (a) that pertaining to negotiations between Dexter and plaintiff, and (b) that which was introduced to show that the Free French were to be the eventual purchasers of the trucks which plaintiff sought to buy. As to the former, it is sufficient to note that we have already pointed out the agency relationship existing between defendant and Dexter. Indeed, exclusion of the testimony explaining what the negotiations between plaintiff and Dexter were could have served only to confuse the jury by omitting essential features of what the trial judge correctly described as a parol agreement partially embodied in a series of letters.[6] Likewise, the testimony concerning the Free French was admissible not only to prove allegations of the complaint about which defendant itself had asked further information,[7] to show that plaintiff had a customer through whom plaintiff was likely to obtain the Permits and to whom plaintiff could also sell spare parts at a profit, but also to indicate that defendant likewise was fully aware of the situation. Refusal of the trial court to exclude that evidence did not constitute reversible error. See 3 Williston on Contracts (1936) § 616.

The objections of defendant to the charge to the jury, for the most part, have already been treated in the foregoing discussion. We believe the charge to the jury was clear and, if anything, may have been more favorable to defendant than the case required.

▮ Finally, defendant urges that the difference between the bid of plaintiff and that of defendant, $7838, was the maximum damage suffered by plaintiff. Our attention has been called to no case supporting that view. Rather, we believe that both federal and New Jersey law take the position that "the effort is made to put the injured party in as good a position as that in which he would have been put by full performance of the contract, at the least cost to the defendant and without charging him with harms that he had no sufficient reason to foresee when he made the contract." Restatement, Contracts (1932) § 329, Comment a; and see New Jersey (1936) annotations thereto, and Dyal v. Wimbish, 5 Cir., 1941, 124 F.2d 464, 467. By this standard, it is immaterial whether or not plaintiff contracted to buy spare parts from defendant. The evidence justified the jury in finding that, but for the bid of defendant, plaintiff would have sold the twenty-five trucks and spare parts in the amount of 15% of the value of the trucks. There was evidence that the profit of plaintiff on the trucks alone might have been as much as $8975 (the difference between a cost of $1530 and a sale price of $1989 per truck, less $100 per unit for boxing). Further, there was testimony from which the jury could find that defendant knew spare parts could also be sold profitably by plaintiff to the purchasers of the trucks. We cannot say that the total sum found by the jury was excessive or capricious.

For the foregoing reasons, the judgment of the district court will be affirmed.

---

[6] For example, the October 27 letter of defendant mentions the place of delivery as Newark, N. J., a provision absent from the previous correspondence.

[7] In a Bill of Particulars filed prior to its answer to the complaint.