**ORIENT MID-EAST GREAT LAKES
SERVICE, Appellee,**

v.

**INTERNATIONAL EXPORT LINES,
LTD., Appellant.**

No. 8785.

United States Court of Appeals
Fourth Circuit.

Argued Jan. 11, 1963.

Decided March 19, 1963.

John H. Skeen, Jr., Baltimore, Md.
(William A. Skeen, Baltimore, Md., and
Platow & Lyon, New York City, on the
brief), for appellant.

William A. Grimes, Baltimore, Md.
(Wharton Poor, New York City, Ober,
Williams, Grimes & Stinson, Baltimore,
Md. and Haight, Gardner, Poor & Havens, New York City, on the brief), for
appellee.

Before SOBELOFF, Chief Judge, and
BRYAN and BELL, Circuit Judges.

**520**

ALBERT V. BRYAN, Circuit Judge.

An oral charter party of the S. S. Hong Kong Exporter, we think, was not established as a matter of law by the facts found in this case by the District Court. Therefore, although the fact findings are supported by the evidence, its decree adjudging the vessel's owner, appellant International Export Lines, Ltd., liable to Orient Mid-East Great Lakes Service, appellee and asserted charterer, for refusing to honor the "charter" cannot stand.

It is an issue solely of general contract law: whether a charter of Hong Kong Exporter was ever unconditionally accepted by her owner. Although the cause is in admiralty—a libel of the ship by the apparent charterer for damages for breach of charter—the governing principles are not different from those of the common law. Hughes, Admiralty Law § 84 (1901). See Phoenix Const. Associates v. City of New York, 33 F.Supp. 666, 667 (E.D.N.Y.1940).

Though the owner, International, is a British corporation and sails the vessel under British registry, her officers and crew are Nationalist Chinese. For convenience the appellee Orient, a Liberian corporation, will here be designated as the charterer although we find no charter. Both owner and charterer were customers of the brokerage firm of Funch, Edye and Son Co. in New York. In the instant transaction the owner was represented by its agents, Morley L. Cho and C. Y. Tung. For the charterer Orestes Pendias acted; for the brokers the chief participants were James McNelis (Jim) and Gerald Harris.

The decisive events occurred May 18 and 19, 1961. Alert to keep owner's vessels on charter as well as to provide bottoms for charterer—as it had done for both of them over the years—broker learned that Hong Kong Exporter was available for hire and so informed charterer. Whereupon, charterer submitted an offer to broker for a time charter of Hong Kong Exporter, the general terms being those contained in the Government Form approved by the New York Produce Exchange in 1946. Importantly, after stipulating the duration as 12 to 15 months and hire of $29,000 per month, the charter party (1) excluded Red China, Russia and Israel from the trading limits of the vessel, and (2) restricted the amount of stores and water to be allowed the owner to 250 tons. The offer, received on May 18, 1961 by the broker, was conveyed to owner in the late afternoon of the same day.

Broker by telephone scrupulously and repeatedly stated to owner each term and stipulation of the offer. No trade limit exclusions other than Red China, Russia and Israel were named. Owner replied that the terms of the offer were acceptable save, aside from some immaterial aspects, as to the allowance for water and stores.

It was not satisfied that 250 tons was adequate for that purpose. Upon this item owner stated it "would have to check Japan" meaning that owner would have to inquire of its general agent or of the vessel in this regard. Both were in Tokyo. After positive assurance from owner that there were no other exceptions, broker phoned charterer the conditions requested by owner. Charterer orally confirmed its acceptance of owner's changes with acknowledgment of the express condition: "subject to the Japanese approval of 250 tons stores and water". The confirmation, with the one condition, was then repeated to owner. At the latter's request broker, still on May 18, cabled owner's general agent in Tokyo (Incships), with wording approved by owner as follows:

IMMEDIATE INCSHIPS
TOKYO (JAPAN)

HONGKONG EXPORTER FIXED 12/15 MONTHS 29000 ALL DETAILS AGREED EXCEPT 250 TONS STORES WATER WHICH SUBJECT YOUR CONCURRENCE STOP MORLEY REQUEST WE CABLE YOU DIRECT FOR REPLY US 10AM NYTIME MAY 19 STOP VESSEL RETAINS BRITISH FLAG AND TO BE EQUIPPED GREAT LAKES FITTINGS

JAPAN STOP DETAILS WILL TLEX REGARDS JIM [McNelis]

FUNCH

The following day, May 19, broker received from Incships a cable as follows:

FUNCH NEW YORK

JIM [McNelis] HKEXPORTER YOURS THANKS NOW ASCERTAINING FROM MASTER QUANTITY STORES WATER REVERTING SOONEST MEANTIME AWAITING YOUR TELEX REGARDS

INCSHIPS

This message was relayed by telephone to owner who then replied it had received the same type of cable from Tokyo. Owner further stated that it had inquired locally as to the stores and water needed for a vessel such as Hong Kong Exporter and found that 400 tons would be necessary. Admonished by broker that an answer was due charterer by 10:00 o'clock that morning, owner promised a prompt return of broker's call. Accordingly owner called back and asked if "you think you can get them to agree to 400 tons stores and water". Broker's authorized employee, McNelis, received the message and then asked an office associate, Harris, who customarily handled broker's business with charterer, whether 400 tons for stores and water would be accepted by charterer. The associate advised it was too high and suggested that owner name the "best quantity they can give us". The suggestion was passed on to owner who instructed broker to "go back at 350 tons and if they do not agree, we will see what we can work out".

Before broker could tell charterer of the proposition of 350 tons for stores and water, owner (by Cho) called broker and said it would have to have the United Kingdom excluded from the trade limits, inasmuch as a British flag vessel could not go into a United Kingdom port with foreign officers. Broker reminded owner that this exception had never been mentioned before by owner despite broker's insistence time and again that owner list all its reservations. Owner replied that it had overlooked this one.

Broker told charterer the owners required 350 tons for stores and water and "were also asking for exclusion of the U.K. in the trading area". Charterer promised it would call back shortly. While broker was awaiting the return call from charterer, owner called again, this time through another agent in its office (Tung) and said it would also have to have exclusion of the Bahamas as well as U.K. This was because a British vessel could not enter a Bahamian port unless British officered. This message, too, was sent on to charterer, who then responded that it:

"[A]greed to the 350 tons stores and water, however, to accommodate Owners, he [agent for charterer] stated—they maintained the fixture but were prepared, without prejudice, to agree [to] exclude U.K. and also exclude Bahamas except during emergencies as determined by Charterer, provided 300 tons stores and water instead [of] 350 tons, and an additional 1¼% address [a commission payable by an owner to a charterer]".

Immediately this proposal was called in to owner who termed it unacceptable. Thereupon owner submitted two alternate proposals, the first calling for 300 tons stores and water, plus 1¼% address, and the other 1¾% address and 350 tons.

None of these three counteroffers was taken. As May 19 was a Friday, conversations were carried over until the following week. These did not result in settlement. Charterer then submitted to owner a formal charter party providing for 350 tons stores and water and the exclusion of only Red China, Russia and Israel. Better commissions were also included. The charter was refused by owner. Charterer notified owner it considered the charter party in effect, demanded performance by owner and advised that it would charter in the market at owner's risk unless owner complied. With no compliance, charterer secured a vessel

elsewhere and libelled Hong Kong Exporter at Baltimore for damages for the alleged breach.

■ No contract, we conclude, evolved from these events which constituted the fact findings of the District Court. Our determination rests primarily on this legal theorem: when an offer or a counteroffer is accepted subject to a condition or reservation, neither party is bound to an agreement until the condition or reservation has been withdrawn or satisfied. Iselin v. United States, 271 U.S. 136, 139, 46 S.Ct. 458, 70 L.Ed. 872 (1926); Nolan Bros. Inc. v. Century Sprinkler Corp., 220 F.2d 726, 728 (4 Cir.,1955); United States v. Mitchell, 104 F.2d 343, 346 (8 Cir.,1939); Hoffstot v. Dickinson, 166 F. 2d 36 (4 Cir.,1948); Corbin, Contracts §§ 90-92 (1952).

Here charterer made an offer, owner came back with a request for immaterial changes and also with a reservation in respect to the space to be allowed for stores and water. In return charterer accepted the proposed changes, noted the reservation as to stores and water and awaited word from owner as to its demand under that head. The reservation was never met and never withdrawn.

■ It is immaterial whether charterer or owner was the initial offeror. Each of the proposals, no matter from which side it came, was subject to agreement on stores and water. Owner, evidently without further notice from Tokyo, submitted the figure of 350 tons to broker, but before the quantity was quoted to charterer, the reservation was enlarged by owner to embody a further exclusion so as to put United Kingdom out of bounds. Until the original reservation had been settled or retracted, owner was not obligated to any contract whatsoever or to the pursuit of further intercourse. Iselin v. United States, supra, 271 U.S. 136, 139, 46 S.Ct. 458, 70 L.Ed. 872 (1926); Nolan Bros. Inc. v. Century Sprinkler Corp., supra, 220 F.2d 726, 728-729 (4 Cir., 1955).

At that point owner with immunity could have entirely retired from the ex-changes. Obviously, it then had the concomitant privilege, also, to expand the reservation or to insist upon further reservations. This owner did, never receding, however, from insistence upon additional space beyond the 250 l. t. first mentioned.

■ To escape this conclusion, charterer attempted to accept one part of the reservation—350 tons for stores and water—and refuse the added exclusion. The two were inseverable, for the latter had not been resolved when the trade limit was increased. This was not acceptance of owner's counteroffer but itself a counteroffer. Peerless Cas. Co. v. Housing Authority, 228 F.2d 376, 378 (5 Cir., 1955); Hoffstot v. Dickinson, supra, 166 F.2d 36 (4 Cir.,1948); See Nolan Bros., Inc. v. Century Sprinkler Corp., supra, 220 F.2d 726, 728-729 (4 Cir.,1955). It was never approved by owner.

The subsequent conversations are of no consequence; they were simply an attempt to repair the prior negotiations after they had fallen apart. Neither party relies upon them to sustain or defeat the libel.

■ Again, charterer asserts that stores and water was a minor term and, in short, the contract was a consummated pact irrespective of a decision on stores and water. There is, indeed, authority to the effect that unimportant details may by consent be deferred to subsequent determination without leaving the contract undone. Mid-Continent Petroleum Corp. v. Russell, 173 F.2d 620, 623 (10 Cir., 1949); Falstaff Brewing Corp. v. Iowa Fruit & Produce Co., 112 F.2d 101, 106 (8 Cir., 1940); Corbin, Contracts § 95 (1952); Restatement, Contracts § 32, Illus. 11 (1932). Further, even a major term, when it can be measured by standards already settled upon in other parts of the agreement, may be held in suspense without express assent. E. g. Shader Contractors, Inc. v. United States, 276 F.2d 1 (Ct.Cl.1960); Corbin, Contracts § 100 (1952).

■ But we need not deal with these principles, because quite plainly *both* par-

ties understood stores and water to be a critical term of the proposed agreement. Until it was mutually adopted, no clause of the charter party was effective. Compania Bilbaina v. Spanish-American Light & Power Co., 146 U.S. 483, 497, 13 S.Ct. 142, 36 L.Ed. 1054 (1892).

To begin with, charterer acquiesced in the interruption of the negotiations solely to obtain word from Tokyo as to stores and water. Furthermore, no assertion of agreement was advanced by charterer while stores and water was unfixed. Omission of mention of it in owner's letter of charter rejection does not prove the provision insignificant or waived. The reason is that the finally tendered charter included a provision for 350 tons stores and water, the very figure sought by owner. This still left open the demanded trade exclusion of U.K., but there was no further difference on stores and water.

■ Nothing is more indicative of the intent of parties to a transaction than their common interpretation of their own words and acts. Eastmount Const. Co. v. Transport Mfg. & Equip. Co., 301 F.2d 34, 39 (8 Cir.,1962); cf. Samann v. Commissioner, 313 F.2d 461 (4 Cir., 1963). Here, charterer as well as owner plainly treated stores and water as an essential of the agreement. We simply take them at their word.

■ Finally, the words and acts of the parties quite plainly also manifest their intent, from the very beginning, that the ship's engagement would await execution of a written memorial of its terms. With the District Judge we see the parties conducting their negotiation "in the ordinary manner under maritime law and contemplated the usual charter"; but we think erroneous his further conclusion that this included an "oral contract". The "usual" charter in our reading of the testimony would not be "oral". See also Hughes, Admiralty, supra, § 83, p. 156. This conclusion obviates the need for a ruling upon the validity of an unwritten charter party. See Kossick v. United Fruit Co., 365 U.S. 731, 734, note 4, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961).

As the bargaining never came to rest in a complete writing, the parties' intendment was not achieved, and so no charter resulted. That from the outset the parties looked to the ultimate embodiment of their agreement in a writing first appears from the initial approach by charterer. Its agent testified that the offer was founded upon the Government Form time charter already mentioned. A charter in this form underlaid all subsequent interchanges. There was never any question about it. The trading dealt exclusively with insertions or variations in the form, never with its discard.

Concededly, obligations could have been actually assumed prior to the signing of the formal charter. But no such purpose is demonstrated in the exchanges between the parties. The nature of the charter proves that it was too much for a verbal understanding only. A worldwide charter, with a duration of more than a year and a rate of hire of the not inconsiderable sum of $29,000 per month, was at stake. Additional to the standard clauses, numerous special stipulations had to be taken care of. Parties so experienced in maritime matters, it is not readily conceivable, would leave their insistences and forbearances in an undertaking of this scope to the vagaries of human recollection.

But even if agreement was not deferred until signatures were affixed to a charter party, at least a "fixture letter"—a letter or memorandum of the broker or parties summarizing their accord—was anticipated by the parties before they should become firmly bound. Not only is such an interim notation of terms customary, here one was actually prepared. But it was never issued. A fair inference is that it was withheld for want of final acceptance of the proposals. This state of negotiation is recited in the cable, supra, of broker to charterer's agent at Tokyo: "Hong Kong Exporter fixed * * * subject your concurrence * * *."

In circumstances, such as we now have, evincing an intent to delay approval until all the covenants and concessions may be aligned in a written document for a last appraisal, the law considers there is no meeting of the minds prior to the adoption of the incorporating writing. Banking & Trading Corp. v. Floete, 257 F.2d 765, 769 (2 Cir.,1958); Julius Kayser & Co. v. Textron, Inc., 228 F.2d 783, 790 (4 Cir.,1956). Interestingly, Corbin on Contracts, supra, § 30 p. 48, includes our very situation in exampling instances of when the parties are taken to have intended their agreement to await reduction into a final writing: "(2) Next, there are cases in which they [the parties] clearly point out one or more specific matters on which they must yet agree before negotiations are concluded".

With no contract, the decree of liability must be set aside and the cause remanded to the trial court with directions to dismiss it.

Reversed and remanded.