**KENTUCKY SKILLED CRAFT GUILD,**
**Plaintiff-Appellee,**

v.

**GENERAL ELECTRIC COMPANY,**
**Defendant-Appellant.**

**No. 20032.**

United States Court of Appeals,
Sixth Circuit.

Aug. 12, 1970.

McCree, Circuit Judge, dissented and filed opinion.

Galen J. White, Jr., Louisville, Ky., for defendant-appellant; John E. Tarrant, Louisville, Ky., on brief; Bullitt, Dawson & Tarrant, C. A. Barreca, Louisville, Ky., of counsel.

Raymond L. Sales, Louisville, Ky., for plaintiff-appellee; Raymond L. Sales, Louisville, Ky., on brief; Segal, Isenberg, Sales & Stewart, Louisville, Ky., of counsel.

Before PHILLIPS, Chief Judge, and CELEBREZZE and McCREE, Circuit Judges.

CELEBREZZE, Circuit Judge.

This is an appeal from a Judgment of the United States District Court for the Western District of Kentucky. This action was brought under Section 301 of the Labor Management Relations Act of 1947, as amended 29 U.S.C. § 185 (1964), and the Federal Declaratory Judgment Act, 28 U.S.C. § 2201, by the Kentucky Skilled Craft Guild (hereinafter, the "Union") seeking an interpretation and enforcement of certain labor agreements it made with the General Electric Company (hereinafter, the "Company"). The District Court held that the terms of a settlement agreement reached by the parties in October, 1966, require that a subsequent supplemental agreement with respect to apprentice pay rates reached in February, 1967, was to be instituted retroactive to an October 3, 1966 date, as provided in the parties' settlement agreement.

The Union has represented the tool, die, and mold makers, both journeymen and apprentices at the Company's facility in Jefferson County, Kentucky since 1960. In 1963, the Union and the Company entered into a contract which expired on October 2, 1966. That contract did not contain a negotiated agreement as to the pay rate structure for apprentices represented by the Union, rather these rates had been set unilaterally by the Company.

In anticipation of the expiration of the 1963 collective bargaining agreement, the Company and the Union held, in June or July, 1966, a few informal pre-negotiation sessions to discuss a new agreement. Formal negotiations were commenced in August, 1966. At both the informal and formal negotiations the Union expressed its intention to bargain collectively with regard to a number of issues including apprentice pay rates.

During the course of negotiations, a number of issues arose with respect to the main body of the labor contract (master contract), initially proposed by the Company on September 14, 1966, and several additional matters upon which supplemental agreements between the parties were contemplated as part of the new three-year collective bargaining contract. Those matters, apart from the master contract on which the Company and the Union exchanged letters or formal talks, were a new transfer procedure, subcontracting, seniority lists, priority work schedules for Union officers and apprentices issues. Also, the Union filed a grievance with the Company which the parties considered during negotiations.

With regard to issues concerning apprentices, the Union's representative wrote a letter on September 21, 1966 making ten separate proposals concern-

ing apprentices it represented.[1] The Company responded in two separate letters on September 23, 1966 by agreeing to commence negotiations on supplemental agreements after the completion of negotiations on the master contract.[2] The negotiations by the parties on these supplemental agreements concerned terms and conditions of employment and could have been a basis for a strike, although during negotiations the parties believed that the most likely strike issues were the master contract proposed by the Company on September 14, 1966 and the grievance filed by the Union on September 28, 1966.

Although the parties' former three-year collective bargaining agreement expired on October 2, 1966, the negotiations of the parties continued in the presence of a federal mediator. On October 17, 1966, with a strike deadline approaching, the parties met and signed a settlement agreement, the "Memorandum of Settlement," covering issues arising from the master contract and from "various letters of intent."

The Memorandum of Settlement provided:

## MEMORANDUM OF SETTLEMENT.

General Electric Company, hereafter referred to as Company, and the Kentucky Skilled Craft Guild, hereafter referred to as Union, in settlement of their current collective bargaining negotiations, hereby agree as follows:

1. The Union accepts the Company's settlement proposal contained in the Company's letter dated September 14, 1966,* and as modified by the oral presentation to the KSCG Negotiating Committee on October 14, 1966.

2. Not later than 30 days after the date hereof, the Company and the Union will enter into agreements achieving full settlement of all issues currently open for negotiations between them, which agreements will reflect acceptance of the Company's proposal referred to in Section 1 above.

3. If the parties consummate the agreements referred to in Section 2 above within the time period specified therein, said agreements shall be made effective as of October 3, 1966, and both the first wage and salary increase and the skilled trade adjustment contained in the Company's proposal shall become effective as of the same date.

Signed this 17th day of October, 1966.

General Electric Company
(Signed) B. B. Ballance
*Including various letters of intent BB 10/17/66

Kentucky Skilled Craft Guild
(Signed) Willie O. Grau
(Signed) William M. Waggoner
(Signed) George "E." Moore
(Signed) David H. Conrad

According to the testimony of officers and representatives of the Union, issues involving apprentices and apprentices pay rates were raised at the time the Memorandum of Settlement was signed on October 17, 1966 and in the immediate weeks that followed. Further, these witnesses related that the Company rebuffed all Union attempts or suggestions to negotiate these issues in the several weeks that followed the signing of the Memorandum of Settlement, the Company's alleged excuse being the pressure of other issues and other negotiations. The Company representative, Mr. Ballance, denied that the Union representative ever made any serious attempt to negotiate the apprentice issue between October 17, 1966 and the end of the month of November, 1966. However, Mr. Ballance did state that there was "a lot of activities going on demanding my attention" including other contract negotiations and negotiations over other is-

---

1. See Appendix A.

2. See Appendix B.

sues with the Union such as the grievance filed by the Union and the transfer procedure.

In December, 1966 Mr. Bradford replaced Mr. Ballance as principal spokesman for the Company in the contract negotiations. Mr. Bradford testified "shortly after becoming manager of Union relations," the Union's representatives raised the issues of apprentice rates and in response he set up meetings on the subject. He further testified that at each subsequent meeting the Union called to his attention and maintained that the effective date of any apprentice rate proposal be retroactive to October 3, 1966 as required under the provisions of the Memorandum of Settlement. He further acknowledged that Mr. Ballance had informed him that apprentice rates were an issue open for discussion; but that, in response to the Union's position, the Memorandum of Settlement had "no relationship to the subject that you are discussing relative to apprentices."

In February, 1967, after further negotiating with the Union, the Company submitted its first proposal with reference to apprentice pay rates which would have had an effective date in February, 1967. After some minor redrafting by the parties, the Union verbally accepted the Company's offer conditioned upon an effective date as set out in the Memorandum of Settlement. Without further agreement, the Company instituted the "conditionally accepted" proposal with an effective date in February, 1967, rather than in October, 1966, as provided by the Memorandum of Settlement. This litigation ensued.

The sole legal issue is whether the apprentice pay rates instituted in February, 1967, should be made retroactive to October 3, 1966, under the provisions of the Memorandum of Settlement.

First, the Appellant contends that the terms of the Memorandum of Settlement do not encompass any supplemental agreement reached with respect to apprentice pay rates. The District Court found as a fact that the apprentice pay rate issue was within the scope of the Memorandum of Settlement and a subsequent supplemental agreement covering that issue was contemplated by the parties under clause two of the Memorandum of Settlement. We agree.

The Memorandum of Settlement was prepared on a "standardized form" supplied by the Company for use nationally in its labor negotiations.[3] It speaks generally of "issues open for negotiations" but does not specifically mention apprentice issues within its text. It is conceded by the parties that the Memorandum's standardized form language is ambiguous with respect to apprentice issues. In an effort to clarify this ambiguity and define all those "issues open for negotiations" about which the Company had agreed or proposed to bargain, Union representatives amended the first clause of the standardized form contract by a footnote which reads: "including various letters of intent." At trial, there was conflicting testimony whether the parties meant to include the exchange of the September 21st and 23rd letters concerning apprentices as "letters of intent."[4] The District Court credited the Union representatives' understand-

---

3. As Mr. Ballance, the Company's principal representative testified, "[The form was] very poorly drafted for those of us who are negotiating local contracts entirely with local unions [as in the instant case]." A number of proposals concerning various issues were raised during the local negotiations which extended beyond the scope of the "master contract" which the standardized form purported to cover.

4. Three officers of and negotiators for the Union testified that the September letters

concerning apprentices were specifically considered to be "letters of intent." Further, that the Union expressed at the time of the signing of the Memorandum that its acceptance of these "letters of intent" bound the Company to negotiate with it as to these matters. The Company's principal representative denied that he considered the September letters to be "letters of intent;" but he acknowledged that the apprentice issues were "open" and to be "negotiated" and "resolved" as of the date of the Memorandum Settlement.

ing of the purpose of the amendment to include letters considering open "issues" such as those concerning apprentice pay rates as "letters of intent," rather than the understanding of the Company's representatives. *See* Traveler's Indemnity Co. v. Pray, 204 F.2d 821, 823 (6th Cir. 1953); 3 Corbin On Contracts, §§ 548, 559 (1960 ed.). Further, by reading the contract as a whole, the first two clauses of the Memorandum of Settlement establish a symmetry of obligations upon the parties. 3 Corbin On Contracts § 549 (1960 ed.). The first clause sets out the scope of the proposals as to the master contract and "letters of intent" which the Union agreed to accept to call off a strike; and the second clause sets out the same proposals as to the master contract and "issues currently open" (a substantial equivalent of "letters of intent") as those about which the Company and Union "will enter into agreements." Since the apprentice issues were concededly "issues currently open for negotiations," it is fair to infer that the September letters agreeing to discuss those issues were "letters of intent" and contemplated under the Memorandum. 3 Corbin On Contracts § 548 (1960 ed.).

▪ We must consider the principle that the language in a standardized form is to be construed strictly against the party which proffered it, the fact that the course of dealings between the parties covered a broad range of issues, and the symmetry of the language of the first two clauses of the amended Memorandum of Settlement. Based on these considerations, we cannot say that the District Judge, who also had the opportunity to evaluate demeanor evidence, made an erroneous factual determination with respect to the scope of the Memorandum of Settlement. Rule 52(a), Federal Rules of Civil Procedure. We affirm the District Court's findings that the terms of the Memorandum of Settlement may encompass a supplemental agreement reached by the parties with respect to apprentice pay rates.

Second, Appellant contends that as a matter of law the negotiations of the parties never resulted in an agreement as to apprentice pay rates; but that if such an agreement was reached it was effective as of February 13, 1967 as the Company proposed, rather than as of October 3, 1966, as provided in the Memorandum of Settlement.

We believe that the District Court properly found that the representatives of the Union did not agree to the offer of the Company which was to have an effective date of February 13, 1967. There was no memorialized agreement to that effect and there is substantial evidence to the contrary. The course of dealing between the parties prior to and in the month after the Memorandum was signed; the unvarying position of the Union on the issue of retroactivity in negotiations as testified to by the Company's representative Bradford; the Union vote of "conditional acceptance;" and a letter which the Union sent to Company representatives on March 9, 1967, reasserting its position that the effective date of the contract must be October 3, 1966—all corroborate the testimony of the Union officers and representatives which was credited by the District Judge who had opportunity to view the demeanor evidence. We find that the parties did not enter, as the Company contends, into an agreement on apprentice pay rates with an effective date in February, 1967.

▪ We now turn to the issue of whether the parties reached any supplemental agreement in February, 1967. We believe for the reasons hereinafter set forth that the course of dealings engaged in by the parties which culminated in the Company's conduct of instituting an apprentice pay raise identical to the one the Union had verbally accepted created a supplemental agreement-in-fact whose effective date would be governed by the parties' prior settlement agreement, absent a clear and unequivocal waiver by the parties of the application of the Memorandum of Settlement.

During the course of dealings of the instant negotiations, both parties were under a statutory duty to bargain in good faith as to their terms and conditions of employment. 29 U.S.C. §§ 158(a) (5), 158(b) (3) and 158(d) (1964). On October 17, 1966, in the presence of a federal mediator as the parties approached a strike deadline, they signed a settlement agreement increasing their bargaining responsibilities to each other in order to avoid a work stoppage by either side. That agreement, the Memorandum of Settlement, contains three clauses which on their face purport to govern the effective date of certain labor agreements made supplemental to the parties' master collective bargaining contract.

The first clause sets out the scope of the settlement and the primary consideration to be supplied by the Union to support the Memorandum of Settlement and to refrain from striking. It provides that the Union shall accept "the Company's settlement proposal [on the master contract], including various letters of intent, and as modified by * * * oral presentation * * * on October 14, 1966."

The second clause sets out the Company's primary consideration for the settlement agreement as "[n]ot later than 30 days after the date hereof, the Company and Union *will enter into agreements* achieving full settlement of all issues currently open for negotiations between them." (emphasis added). It further provides that such "agreements" reflect and are in response to the consideration given by the Union under the first clause of the Memorandum.

The third clause sets out a retroactive effective date for supplemental agreements reached within the time period and conditions set out in the second clause. In so doing, it affirms the intent of the Memorandum of Settlement to impose upon the parties' pre-existing statutory duty to bargain in good faith the additional responsibility that the parties "will enter into agreements on all issues currently open for negotia-

tions." The third clause recognizes, however, that the parties, through no fault of their own, might enter into supplemental agreements after the time period allotted for in the second clause. In such instances where the "parties [do not] consummate the agreements referred to in Section 2 above within the time period specified therein," the supplemental agreement which is eventually reached will not automatically be retroactive to an October, 1966, effective date.

There is no question that the Union has given substantial consideration to support the validity of the Memorandum of Settlement. By its acceptance of the master contract and its forbearance from striking, the Union has relied upon the Company to fulfill its part of the settlement bargain—which is a specific intent to achieve full settlement of all issues open for negotiation such as the apprentice pay rate issue. On the other hand, the Company now seeks to treat the consideration it has given in the Memorandum of Settlement as, in large part, illusory. This Court must, if possible, construe the language in the Memorandum that "the Company and the Union will enter into agreements" so as to give it legal effect, because that language expresses a significant part of the Company's consideration under the Memorandum. At the very least that language, read as part of the whole contract, expresses a specific intent by the parties to reach "full settlement * * * of all issues * * * [in the] negotiations," such as the apprentice pay rate. In the context of the instant labor negotiations, we believe that the Company's conduct in immediately enacting the precise apprentice pay rates which the Union had "conditionally accepted" must be construed as an acceptance of the Union's "conditional acceptance" or counter-offer. It is an expression-by-conduct of both parties' contractually expressed specific intent to reach full settlement on such issues. 3 Corbin On Contracts §§ 538, 545 and 549 (1960 ed.).

It should be noted that we do not hold, as the Company contends, that "GE was inextricably bound by the Memorandum of Settlement to place any apprentice agreement it proposed into effect on October 3, 1966." Our decision relies on an interpretation of the Memorandum based upon the Company's conduct throughout the course of negotiations. Given the contractual intent to agree, the Company's subsequent conduct and the absence of a signed memorialized statement to the contrary, we have concluded that the parties had entered into a supplemental agreement-in-fact with respect to apprentice pay rates.

Finally, the Company contends that the 30-day limitation on the retroactivity contained in the Memorandum of Settlement bars any retroactive application of the supplemental agreement on apprentice pay rates which was made four months after the signing of the Memorandum of Settlement. The District Court found,

> "[The] Company by its own conduct in refusing and failing to meet with or attempt any negotiations with the Plaintiff Union during the thirty day period following October 17, 1966, and by waiting until February 15, 1967, before making its first proposal concerning apprentices waived its right to insist upon the thirty day provision and is now estopped from asserting the thirty day provision by its own conduct."

We agree.

In Gulf Oil Corporation v. American Louisiana Pipe Line Co., 282 F.2d 401 (6th Cir. 1960), this Court discussed the obligations of a contractual relationship between a supplier to a pipeline company. We held:

> "Where liability under a contract depends upon a condition precedent one cannot avoid his liability by making the performance of the condition precedent impossible, or by preventing it. Suter v. Farmers Fertilizer Co., 100 Ohio St. 403, 441, 126 N.E. 304; Atlas Trading Corp. v. S. H. Grossman, Inc., 3 Cir., 169 F.2d 240; Corbin On Contracts § 1266 (1951 ed.).

> "Certainly Gulf [the supplier] may not rely on the delay which it brought about by its own conduct to justify its cancellation of the contract. It was obligated to do nothing which would hinder, delay or prevent the granting of its certificate within the time provided by the contract." 282 F.2d at 404–405.

Applying this principle of estoppel, the Company's conduct in making no effort to propose or conclude any agreement with respect to apprentices within the thirty day period, its failure to respond to the Union's attempts to reach agreement on those issues within the thirty day period, and its failure to raise the thirty day limitation when the Union repeatedly asserted in negotiations that apprentice pay rates must be made retroactive now estops the Company from asserting the thirty day limitation to bar the retroactive pay feature of the instant supplemental agreement with respect to apprentice pay rates.

We have reviewed all other alleged errors raised upon appeal and find them without merit. The judgment of the District Court is affirmed.

APPENDIX A: Union Proposal Letter

[LETTERHEAD OF KENTUCKY SKILLED CRAFT GUILD]

September 21, 1966

APPRENTICE PROPOSAL

(Not all inclusive)

1. Higher starting rate to coincide with journeyman pay rates up to R-22.
2. Higher graduation pay—R-25.
3. J.A.T.C. committee or similar voice in apprentice training program.
4. Ration of apprentices to journeyman, 1-7 journeyman, (in toolroom area).
5. System to provide representation for apprentices outside tooling areas.
6. Strict toolroom assignments for those requesting same.
7. Pay for schooling outside working hours, tuition refund program.

8. Credit toward graduation for all hours in excess of 40 hours per week, 8 hours per day.

9. Provision to schedule academic load over total length of program.

10. Layoff strictly according to seniority.

### APPENDIX B: Two Responding Letters Of The Company

September 23, 1966

Mr. W. O. Grau, President
Kentucky Skilled Craft Guild
7805 Seebolt Drive
Louisville, Kentucky

Dear Mr. Grau:

The Company proposes the following regarding apprentices represented by the Kentucky Skilled Craft Guild:

Upon completion of negotiations with the KSCG on a new contract, the Company agrees to commence negotiations on a supplemental agreement covering the following items:

1. Representation for Apprentices on Assignment Outside Department Toolrooms

The Company is agreeable to the concept of having one Union representative, selected by the KSCG, represent these employees—provided however that should such representative be an apprentice, he will not receive credit toward completion of the training program for that time spent on Union business.

2. Layoff and Recall

Layoffs of apprentices while on program have not occurred at Appliance Park. This area would seem, therefore, not to present a major problem. However, the Company agrees to negotiate a procedure to be followed in the event layoffs should occur in the future. In this procedure, major consideration will be given to the relative length of bargaining unit seniority.

3. Ratio of Apprentices to Tool and Die Makers in Product Department Toolrooms

It is understood that the ratio of apprentices to Toolmakers in the various department toolrooms will vary in accordance with the needs of the business. Generally, the Company is agreeable to the establishment of a benchmark ratio of one apprentice per six Toolmakers; it being understood that should this ratio be exceeded, the Company agrees, upon request of the KSCG, to review the reasons therefore.

4. Apprentice Toolroom Assignments

Recognizing that it is advantageous to both the trainee and the Company to provide toolroom assignments to those trainees desiring such assignments, the Company agrees to give such assignments where possible; it being understood that the needs of the business will determine the number of such available openings,

5. Classroom Schedules

Academic courses will be scheduled over the entire tenue of the Apprentice Training Program.

Very truly yours,
B. B. Ballance
Manager—Hourly Employee Relations

BBB/bf

September 23, 1966

Mr. W. O. Grau, President
Kentucky Skilled Craft Guild
7805 Seebolt Drive
Louisville, Kentucky

Dear Mr. Grau:

Following completion of contract negotiations with the KSCG, the Company agrees, within a reasonable time thereafter, to commence discussions on the rate structure (starting rates, progression rates, and rate upon graduation) for the apprentices represented by the Kentucky Skilled Craft Guild.

Very truly yours,
B. B. Ballance

Manager—Hourly Employee Relations
BBB/bf

McCREE, Circuit Judge (dissenting).

I respectfully dissent. The company's proposal for a new apprentice pay rate and progression schedule clearly stated that the effective date of the agreement would be "the Monday of the week in which the Union advises the Company" that the proposal was acceptable. As the majority observed, the union "conditionally accepted" the company's proposal, but insisted on an effective date retroactive to October 3, 1966. The company never accepted this counter-offer, but instead unilaterally instituted the new rates and schedule, effective as of February 13, 1967. Under these circumstances, there never occurred a "meeting of the minds" necessary to the formation of a binding contract. *See* Orient Mid-East Great Lakes Service v. International Export Lines, Ltd., 315 F.2d 519, 522 (4th Cir. 1963). Accordingly, I would hold that plaintiff-appellee union failed to sustain its burden of establishing the existence of a binding contract with an effective date of October 3, 1966 and I would reverse the judgment of the District Court.