UNITED STATES of America,
Appellant,

v.

NEWPORT NEWS SHIPBUILDING
AND DRY DOCK COMPANY, and
Tenneco, Inc., Appellees.

No. 77–1748.

United States Court of Appeals,
Fourth Circuit.

Argued Oct. 4, 1977.
Decided Feb. 27, 1978.

Patricia N. Blair, Atty., Civ. Div., Dept. of Justice, Washington, D. C. (Barbara Allen Babcock, Asst. Atty. Gen., William B. Cummings, U. S. Atty., Alexandria, Va., Leonard Schaitman and Stuart E. Schiffer, Attys., Civ. Div., Dept. of Justice, Washington, D. C., on brief), for appellant.

K. Martin Worthy, Washington, D. C. (John G. DeGooyer, Mark Sullivan, III, John H. Spellman, Jeffrey M. Petrash, Larry H. Mitchell, Hamel, Park, McCabe & Saunders, Washington, D. C., William McL. Ferguson, Ferguson & Mason, Newport News, Va., on brief), for appellees.

Before HAYNSWORTH, Chief Judge, BUTZNER, Circuit Judge, and FIELD, Senior Circuit Judge.

BUTZNER, Circuit Judge:

The United States appeals from an order of the district court enforcing an oral settlement purportedly reached between the Department of the Navy and the Newport News Shipbuilding and Drydock Co., and dismissing as moot the government's suit for specific performance of a contract for construction of a vessel. We vacate this order because we conclude that the parties' negotiators did not settle the case orally and because the Attorney General, whose approval was essential, rejected the terms that were ultimately reduced to writing.

I

This litigation arises from the Navy's attempt to exercise an option for construction of the DLGN–41, the fourth ship in a class of nuclear powered guided missile frigates. As part of an agreement to negotiate a number of disputed matters, the final date for exercising this option was extended to February 1, 1975. In the meantime, the Navy authorized the shipyard to start preconstruction work. In August 1974, however, the shipyard notified the Navy that for a variety of reasons it considered the option invalid. The Navy disagreed, and on January 31, 1975, it formally undertook to exercise the option. The parties then signed a memorandum of understanding obligating the shipyard to continue its preconstruction work while they negotiated. In August 1975, the shipyard exercised its right to cancel the memorandum of understanding because it was dissatisfied with the progress of the negotiations.

As a result of the cancellation, the Navy filed this suit seeking specific performance of the contract and a temporary restraining order directing the shipyard to resume work on the vessel. At a hearing on August 29, 1975, the district court adopted as its order a stipulation by the parties providing for continued work on the ship, for continued payment for work performed, and for negotiations "in good faith to reach an agreement as rapidly as possible to modify those contract provisions requiring amendment or to take other appropriate action."

The shipyard, again dissatisfied with the Navy's negotiating tactics, filed a motion on July 13, 1976, for enforcement of the court's order to negotiate in good faith. It also sought to have its obligation to continue work suspended until the Navy complied. The Navy countered by designating as its negotiator Gordon W. Rule, an experienced

civilian official in the procurement office. In view of this development, the shipyard requested the court to reserve ruling on its motion.

Rule began negotiating with the shipyard on July 15, 1976, and subsequently the Navy issued him a contracting officer's warrant granting him "unlimited authority with respect to negotiations." On August 20, 1976, the parties reached what Rule and the shipyard's negotiators considered to be an oral agreement in principle which the Navy later estimated would increase the cost of the ship by about 22.7 million dollars.

The shipyard prepared a written first draft of the oral agreement which Rule received on August 30, 1976. The negotiators then met on several occasions to discuss revisions. A second draft was circulated on September 27, 1976, and further discussions concerning revisions were held. On October 7, 1976, the shipyard executed a third draft of the agreement and sent it to Rule. Although Rule signed the draft as presented by the shipyard, he conditioned his execution of the document by the following provisions set forth in his letter returning it to the shipyard:

(i) That ultimate approval must be received from Deputy Secretary of Defense Clements, and

(ii) That escalation under this Mod [i. e., modification of the contract] will be paid by the Government on the basis of the contractor's actual experience or the BLS Indices times 1.25, whichever is less.

On October 15, 1976, Deputy Secretary Clements forwarded a copy of the compromise to the Attorney General with the recommendation that it be approved. The Attorney General, however, disapproved it on November 24, 1976.

During the negotiations dissension had arisen concerning the scope of Rule's duties. Rule thought he possessed plenary authority both to negotiate and to bind the government to any agreement he reached. Immediately after his appointment, he told the shipyard that this was the extent of his power. The Navy agreed that Rule possessed unlimited authority to negotiate, but it denied granting him unreviewable authority to bind the government to a settlement. Alerted by a news report that the shipyard considered the law suit to have been settled on August 20, Rule's superiors explicitly cautioned him several times that any agreement he reached would require approval by higher authorities. The Navy also informed representatives of the shipyard about the necessity for review and approval.

Rule himself appears to have recognized that his authority was not as unrestricted as he first supposed. In a memorandum dated October 5, 1976, he submitted the proposed agreement to the Chief of Naval Material for approval and referred to obtaining "final review and approval" from the Office of General Counsel of the Navy. Finally, the letter addressed to the shipyard accompanying Rule's executed copy of the agreement expressly conditioned his execution of the document on approval by Deputy Secretary Clements.

Shortly after Rule executed the agreement, and even before the Deputy Secretary transmitted his recommendation to the Attorney General, the shipyard moved the district court to enforce the compromise and dismiss the government's action for specific performance. In the alternative, it moved to dismiss the action on the ground that the Navy had failed to negotiate in good faith.

The court considered the shipyard's motion to enforce the settlement without conducting an evidentiary hearing. Relying on affidavits and discovery depositions, it found that Rule had authority to bind the government to the settlement he negotiated; that agreement was reached orally on August 20, 1976, and subsequently memorialized; that Deputy Secretary Clements approved the agreement; and that the Attorney General "is estopped to deny the settlement."

## II

■ We find no reversible error in the Navy's complaint that the district court

should have held an evidentiary hearing on the motion to enforce the settlement. When there is no real dispute about the facts, a court has inherent power to enforce summarily a compromise terminating pending litigation. *Meetings & Expositions, Inc. v. Tandy Corp.*, 490 F.2d 714, 717 (2d Cir. 1974). The only conflict of any significance concerned Rule's duties. We have some doubt that the law and the evidence support the conclusion that the Deputy Secretary vested him with authority to commit the Navy to the expenditure of additional millions of dollars for the construction of the vessel. This issue, however, is not material to our decision. The uncontradicted evidence establishes that by August 25, the Navy had notified the shipyard of the necessity for review and approval of any settlement Rule negotiated. The critical question therefore is whether the August 20 oral agreement was a binding settlement as the shipyard insists and the district court found.

### III

■ Parties to contractual negotiations may enter into an enforceable oral contract that is later to be expressed in writing if, intending to be bound, they reach agreement on all major issues. *Orient Mid-East Great Lakes Service v. International Export Lines, Ltd.*, 315 F.2d 519, 522–23 (4th Cir. 1963); *In Re: ABC-Federal Oil & Burner Co.*, 290 F.2d 886, 889–90 (3d Cir. 1961); 1 A. Corbin, Contracts, §§ 29, 30 (1963); Restatement (Second) of Contracts §§ 26, 32 (Tent. Draft, 1973). Applying this principle to the uncontradicted facts discloses that the parties did not intend to commit themselves irrevocably to an oral settlement of the case on August 20. First, the draft agreement prepared by the shipyard after the August 20 negotiating session contained an escalation clause that computed payments by using indices prepared by the Bureau of Labor Statistics from data concerning steel vessel construction throughout the country. The Navy soon determined, however, that the shipyard's actual costs had increased less than the BLS indices. In subsequent discussions Rule insisted that

the escalation clause be changed to award payments based on the shipyard's actual experience or 1.25 of the BLS indices, whichever was less. Estimating that the difference between the two clauses amounted to about 9.4 million dollars, Rule aptly characterized this issue as substantive. The final draft submitted to Rule on October 7 retained the shipyard's version of the escalation clause, and Rule expressly conditioned his execution of the draft on acceptance of the government's position. Although the shipyard had represented during the negotiations that it would relent" if this issue "became . . . the hinge point" for the whole settlement, it did not accede to the condition Rule imposed. In January 1977, at the hearing on enforcement of the August 20 oral agreement, it pressed for the clause awarding the higher escalation payments.

■ The shipyard's final draft was essentially an offer of settlement. Rule accepted this offer subject to a condition concerning the escalation clause. Under these circumstances, the following principle of law applies: "when an offer or a counteroffer is accepted subject to a condition or reservation, neither party is bound to an agreement until the condition or reservation has been withdrawn or satisfied." *Orient Mid-East Great Lake Service v. International Export Lines, Ltd.*, 315 F.2d 519, 522 (4th Cir. 1963).

Second, by his letter of October 8 transmitting the executed agreement to the shipyard, Rule indicated that he did not intend the government to be bound either by the results of the August 20 negotiations or by his execution of the final draft. In this letter he conditioned his execution of the document by the statement that "ultimate approval must be received from Deputy Secretary of Defense Clements." To sustain its thesis that the August 20 agreement bound the government, the district court construed this condition to mean that Deputy Secretary Clements must "approve the document as memorializing the compromise agreement between the parties." This

restrictive view of the Secretary's function is not supported either by the plain language of the letter or by any action of the Deputy Secretary. He played a far more responsible role than simply determining whether the executed document prepared by the shipyard conformed to the terms of the oral negotiations. Moreover, the Deputy Secretary did not undertake to commit the government to the settlement that Rule had negotiated. In his letter to the Attorney General of October 15, 1976, which is set forth as an appendix, he recognized that final approval rested with the Attorney General.

## IV

■ Title 28 U.S.C. §§ 516 and 519 authorize the Attorney General to supervise all litigation involving an agency of the government unless the law otherwise directs. As an incident to this broad grant, he has authority to agree to dismissal of actions brought by the government. *See* Confiscation Cases, 74 U.S. (7 Wall) 454, 458, 19 L.Ed. 196 (1868). His authority to compromise and settle any case referred to the Justice Department was expressly confirmed by § 5 of Executive Order No. 6166, June 10, 1933, 5 U.S.C. § 901.*

■ Notwithstanding these well established principles, the district court held that the Attorney General was estopped from disapproving the settlement for two reasons. First, it noted that during oral argument the Department of Justice stipulated that when Rule was appointed he had authority to bind the United States. The government, however, protests that it made no such stipulation or concession. It points to portions of the transcript where it specifically denied that Rule could bind the government while recognizing that he had authority to negotiate with the shipyard. The shipyard in its brief does not claim that the government made such a concession,

and we have been unable to find it in the record.

The second reason the district court assigned for its ruling is that the Justice Department took no action to fulfill its obligation to negotiate in good faith pursuant to the court's order "except through its implicit delegation of any authority it had to settle this litigation to the Department of Defense." We conclude that this reason does not provide a sufficient basis for invoking estoppel.

The negotiations concerning settlement of the litigation between the shipyard and the Navy covered many technical issues about the construction of the vessel, the computation of its cost, and a feasible date for its delivery. It was therefore reasonable for the Justice Department attorneys to leave discussion of these complex subjects to Navy officials who had the expertise to deal with them. But another important question was whether the government should press its suit for specific performance of the initial contract instead of compromising, in view of the millions of dollars involved. The answer to this question depended on careful analysis of the strength of the government's claim from both evidentiary and legal standpoints. In turn, the disclosures of that survey had to be weighed against the results of Rule's negotiations. The final product of this study was an assessment of the litigative risk.

The Attorney General did not, either personally or through his subordinates, delegate to Rule the authority to make this critical decision. Moreover, Deputy Secretary Clements, who was the source of Rule's authority, understood that the responsibility for evaluating the litigative risk and consequently for ultimately approving or disapproving the settlement remained with the Attorney General. We therefore conclude that the record does not support the court's ruling that the Attorney General

---

\* Section 5 of Executive Order No. 6166 provides in part:

As to any case referred to the Department of Justice for prosecution or defense in the courts, the function of decision whether and

in what manner to prosecute, or to defend, or to compromise, or to appeal, or to abandon prosecution or defense, now exercised by any agency or officer, is transferred to the Department of Justice.

was estopped. The law pertaining to the Attorney General's control over cases referred to the Department of Justice by other agencies of the government fully sustains his authority to disapprove the proposed compromise.

## V

■ As an alternative ground for dismissing the government's suit for the specific performance of the construction contract, the district court held that the government was barred by the doctrine of unclean hands because it did not negotiate in good faith. The controversy about the government's negotiating tactics centers on the parties' August 29, 1975, stipulation which was incorporated in the court's order. In view of the dispute about the validity of the Navy's option, the parties stipulated that they would "negotiate in good faith to reach an agreement as rapidly as possible to modify those contract provisions requiring amendment or to take other appropriate action." The nub of the issue is the clause "to take other appropriate action." The shipyard contends that this language was intended to impose a duty on the parties to renegotiate the basic contract for the construction of the vessel. Although there was some difference of opinion in its ranks about the meaning of the language, the Navy asserted, at least until the time Rule was appointed its chief negotiator, that it was required to bargain over the basic contract only if the shipyard offered some new legal consideration or demonstrated governmental responsibility justifying more favorable terms.

The Navy's claim of good faith is altogether consistent with paragraph five of the stipulation, which provided, "This stipulation and any action taken by either party pursuant hereto shall be without prejudice to the rights or legal positions of either party." The Navy was not obligated to abandon its legal position in order to demonstrate good faith bargaining if its insistence was sincerely held. *NLRB v. Almeida Bus Lines, Inc.*, 333 F.2d 729, 731 (1st Cir. 1964). Although the underlying facts were not in dispute, there was a controversy as to the inferences that could properly be drawn from them. In the context of this controversy, the clause "to take other appropriate action" is ambiguous; there is a genuine dispute about its meaning. Under these circumstances, summary disposition of the case on the basis of the defense of unclean hands is inappropriate. *American Fidelity and Casualty Co. v. London and Edinburgh Insurance Co.*, 354 F.2d 214, 216 (4th Cir. 1965).

The judgment of the district court is reversed, and the case is remanded for further proceedings consistent with this opinion.

## APPENDIX

### THE DEPUTY SECRETARY OF DEFENSE

WASHINGTON, D.C. 20301
15 October 1976

The Honorable Edward Levi
Attorney General
Department of Justice
Washington, D.C. 20530

Dear Mr. Levi:

This letter forwards a proposed settlement of the CGN–41 litigation negotiated pursuant to Court Order. As you know, I have been deeply committed to efforts to settle the Navy's on-going disputes with the shipbuilding industry and have undertaken a number of initiatives to this end. In a meeting on 13 July 1976, Senior Navy Officials, with my approval, appointed Mr. Gordon W. Rule of the Naval Material Command as the principal negotiator of this particular matter. Mr. Rule has negotiated a proposed modification to the contract with Newport News, attachment (1), on the CGN–41.

In view of the long-standing, acrimonious, and disruptive controversy between the Navy and its sole present new construction surface nuclear warship contractor, I consider it vital to the national defense that

this dispute be resolved as quickly as possible. I consider the proposed modification a reasonable resolution to this complex matter.

Attachment (2) provides a comparative financial estimate of the proposed settlement. While attachment (2) indicates a difference of $22.7M I believe it is reasonable to assume that a Court might grant Newport News, as a minimum, an extension of the existing escalation coverage to an achievable contract delivery date (e. g., August 1980); consequently, the difference in the settlement could be reduced another $7.5M, to $15.2M. We have not included any other assessment of litigative risk since this is a matter under your purview. Quantifying the latter could further reduce or eliminate the $15.2M differential noted above.

In any event, the District Court instructed the parties as follows: "The parties agree to negotiate in good faith to reach an agreement as rapidly as possible to modify those contract provisions requiring amendment or to take other appropriate action." Mr. Rule, in the spirit of this order, negotiated a contract modification which, if approved, would undoubtedly facilitate the construction of the badly needed CGN–41.

Accordingly, I am forwarding the results of these negotiations for your approval and such legal action as may be necessary to obtain ratification.

/s/ W. P. Clements, Jr.

Attachments