Henry E. MORRISON, Walter Solomon, and Morgan Lee, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

The UNITED STATES DEPARTMENT OF LABOR, William Brock, Secretary of Labor, Barbara Ann Farmer, Acting Administrator for Regional Management, Thomas Hill, Regional Administrator, Region II, and The Immigration and Naturalization Service, and Valley Growers Co–Operative, Inc., Mid–Hudson Co–Operative, Inc., Wayne County Growers and Processors, Inc., Northwest Growers Cooperative, Inc., and Nardone Farms, on behalf of themselves and all others similarly situated, Defendants.

No. 86 Civ. 6548.

United States District Court, S.D. New York.

May 16, 1989.

Migrant Legal Action Program, Inc., Washington, D.C. (Edward J. Tuddenham, Shelly Davis, of counsel), Farmworkers Legal Services of New York, Inc., New Paltz, N.Y. (Thomas A. Harnett, Claudia A. Smith, of counsel), for plaintiffs.

Benito Romano, U.S. Atty., S.D.N.Y. (Paul K. Milmed, Asst. U.S. Atty., of counsel), for Federal defendants.

Seyfarth, Shaw, Fairweather & Geraldson, New York City and Washington, D.C. (Thomas Wilson, Michael Hirschfeld, of counsel), for Growers defendants.

## OPINION AND ORDER *

CONBOY, District Judge:

This case arises out of the 1986 apple harvest in New York. Plaintiffs, (the "workers") originally requested a preliminary injunction to enjoin their employers, New York apple growers (the "growers") from paying the wage rate approved by the Department of Labor ("DOL") for the 1986 season as they asserted that it was unlawful. They also sought a declaration that the DOL had failed to enforce its own regulations as well as an injunction prohibiting the "federal defendants" [1] from allowing foreign workers from entering the United States to work for the growers and

---

* This is a corrected version of the Court's Opinion and Order dated May 10, 1989.

1. The "federal defendants" comprise the DOL, high DOL officials, and the Immigration and Naturalization Service ("INS"). Plaintiffs no longer state a claim for relief against the INS.

requiring DOL to revoke its acceptance of the growers' job clearance order. Judge Weinfeld, to whom this case was previously assigned,[2] declined to issue the relief requested by an Order entered October 10, 1986. Later, in the course of this litigation, Judge Weinfeld, certified both plaintiff and defendant classes under Rule 23(b)(2) of the Federal Rules of Civil Procedure.[3] At the present time, the plaintiff class primarily seeks a declaration that the DOL regulations in question were not correctly interpreted by the agency; that the wage rate paid was unlawful; and that the rate should have been higher. In addition, plaintiffs request a declaration that the defendant class violated the DOL regulations and seek restitution from them for the back wages they assert should have been paid. The motions currently before the Court are the motions and cross-motions of all the parties for summary judgment. Oral argument on the motions was had in February of 1989.

## FACTUAL BACKGROUND

The grower defendants utilized the United States Employment Service to recruit workers for the 1986 apple harvest in New York. In brief, the Employment Service, a network of federally funded local employment offices,[4] was established by the Wagner–Peyser Act of 1933, 29 U.S.C. § 49 *et seq.*, as a means of reducing unemployment by matching available jobs in one part of the country with unemployed workers in another. Employers in need of workers file job offers ("clearance orders") with their local employment office. These offers are circulated ("cleared") through the Employment Service to offices in other states. Employers who utilize the system are required to offer certain minimum terms and conditions of work pursuant to DOL regulations. *See generally* 20 C.F.R. Part 653 (the "prevailing wage regulations"). The local office must ensure that the job offers comply with the minimum terms and conditions of the DOL regulations. 20 C.F.R. § 653.501(c).

If the Employment Service is unable to fill all of an employer's needs and the employer receives a certificate from the DOL so certifying, the employer may make up the shortfall by hiring temporary foreign workers. If the employer seeks to hire these foreign workers, called "H–2 workers," the job clearance order must also comply with the H–2 regulations (the "adverse effect wage regulations"), codified at 20 C.F.R. Part 655. In addition, the job clearance order must be approved by the DOL Regional Administrator. It is undisputed that the Grower Defendants utilized temporary foreign workers, and therefore, all the parties agree that the 1986 job clearance orders were subject to the two sets of DOL regulations.[5] What is disputed is whether the DOL, in approving the job orders, made sure that *both* regulations were, in fact, complied with.

In 1986, the prevailing wage rate was a piece rate. Because of a series of rulings by Judge Charles Richey of the District of the District of Columbia and by the Circuit Court of Appeals for the District of Columbia, which require that when a piece rate is offered, it must be a piece rate that is proportional to the adverse effect wage rate ("AEWR"), the growers decided to offer an hourly wage rate for the 1986

---

**2.** Following Judge Weinfeld's death in late 1987, this case was reassigned to us.

**3.** The plaintiff class was defined as follows:
All U.S. workers employed as apple harvest workers during the 1986 apple harvest by New York State apple growers who filed job clearance orders offering to pay workers on a hourly rate basis (with or without a bonus). Stipulation and Order Regarding Class Certification, filed February 3, 1987. The defendant class was defined as follows:
All New York State apple growers who filed job clearance orders for the 1986 apple harvest season offering to pay workers on an hourly rate basis (with or without bonus). *Id.* Of course, there was no class determination necessary as to the "federal defendants."

**4.** States may participate in the program and use federal funds as long as they establish a state agency that meets the requirements of the act and the DOL regulations.

**5.** Therefore, the Growers were obligated to pay the highest wage rate required by the prevailing wage regulations, the adverse effect wage regulations or the Federal or State minimum wage.

harvest season. This conversion from a piece rate to an hourly wage was anticipated by the DOL.[6] The Acting Administrator for Regional Management, Barbara Ann Farmer, wrote a memorandum (the "Farmer Memorandum") to three DOL Regional administrators stating:

> ... such orders should not be rejected *solely* on the grounds that it is the prevailing practice for apple growers to pay by the piece or that the change in method of payment may have an adverse effect on U.S. workers because actual hourly earnings may not be as high as they had been previously when workers were paid by piece rate.
>
> .    .    .    .    .
>
> Generally, 1986 criteria apple orders that offer an hourly rate of pay (at least the AEWR) may be accepted if they otherwise meet regulatory requirements and the regional office is convinced that the same job offer is being made to foreign workers. (emphasis in original).

Exhibit 1 to Plaintiffs' Memorandum of Law in Support of Motion for Summary Judgment ("Plaintiffs' Main Memo."). According to the DOL, there was no methodology in place for computing the prevailing wage when the prevailing method of payment was switched from a piece rate to an hourly rate. On the other hand, there was a methodology available to convert hourly rates into piece rates in order to ascertain a prevailing wage. In an attempt to fill the gap, the policy to accept offers of hourly wages of at least the AEWR by the growers, as memorialized in the Farmer Memorandum, was instituted. It is this agency determination that is at the core of this lawsuit because, pursuant to it, the growers' job orders with fixed hourly wages of $4.56 were approved by the DOL and cleared through the system.

It was the federal defendants' position in the beginning of this litigation (from August 1976—May 1987) that the offer of a fixed hourly wage which was not less than the 1986 AEWR, satisfied both the adverse effect wage regulations and the prevailing wage regulations. However, their position on this issue changed in the middle of this litigation. In May of 1987, the federal defendants "confessed error" to Judge Weinfeld and stated that the prior agency determination—that the prevailing wage regulation had been satisfied—was too hastily made and could not be defended. Their "new" position, as of May of 1987, is that the prevailing wage regulations were not applied by the DOL in approving the 1986 job orders; the DOL had allowed the AEWR to be used *in lieu of* a prevailing wage. This new position was articulated in the Affidavit of Robert A. Schaerfl, sworn to May 8, 1987 ("Schaerfl 5/8/87 Aff.") at ¶ 4.

Of course, the growers vigorously dispute this new position and contend that the prevailing wage regulations were not ignored in the 1986 approvals.[7] On the other hand, the plaintiffs emphatically agree with the new DOL position that the DOL did not properly consider the prevailing wage legislation when approving the 1986 job orders, and that, therefore, these approvals were contrary to law. The plaintiffs believe that if the prevailing wage regulation had been properly considered, the wage offered and paid by the growers would have been higher. Therefore, they believe they are entitled to restitution for the difference between what was paid and what should have been paid.

After this change in position, the government then requested that the action be remanded to the DOL for the purpose of

---

**6.** It should be noted that the employers are not required to use the prevailing method of payment. 20 C.F.R. § 653.501(d)(4); *see also, infra,* at 676.

**7.** Furthermore, it is worth noting that the growers disagree with the plaintiffs' position that the workers were harmed by the switch from a piece rate to the hourly rate. One grower, Mr. Joseph Russo, states in an affidavit, that in the

case of his orchard for the 1986 season, the workers appear to have *benefitted* from the switch from the piece rate to the hourly rate. *See* Affidavit of Joseph Russo, sworn to on December 30, 1987, at ¶¶ 17–18. His workers, on average earned about $90 more per worker than those that worked for him in 1985. *See id.* at ¶ 18. The plaintiffs have not contested the truth of his statement.

developing a methodology so that the proper prevailing wage could be determined, and thus, the proper hourly wage would be ascertainable. Judge Weinfeld remanded the action by Order dated August 31, 1987. In November of 1987, the new methodology was submitted to Judge Weinfeld. However, the information necessary to calculate the proper wage according to the methodology was still being compiled when the summary judgment motion papers were submitted.[8] As of this date, despite many representations by the government that it would be forthcoming, no computation of the "proper" prevailing wage, according to the methodology developed on remand, has been submitted. In the present posture of the case, however, a computation in hand is not necessary.

Significantly, and for different reasons, both the plaintiff and the defendant classes argue in their papers that this Court should not adopt the methodology developed by the DOL on remand. At the oral argument, however, counsel for all of the parties agreed that the issues relating to restitution could be decided without this Court making a finding as to the validity or soundness of the methodology. Transcript ("Tr.") of Oral Argument, February 17, 1989, at 34, 38, 50–51. Plaintiffs' counsel argued, however, that even if the Court decides that restitution is inappropriate, we must nonetheless address the issue of the validity of the methodology so that there is a decision of record should the DOL attempt to apply the methodology in the future. Tr. at 14, 38. The government disagreed, arguing that the issue of the methodology would then be moot as to this class of plaintiffs. Tr. at 34. According to the government's argument, if the DOL seeks to apply the methodology developed for this litigation in other contexts, those who oppose its application in the other contexts would be the only ones with standing to challenge the methodology. Tr. at 34–35.

The Growers essentially agree with the Government that there is no need for us to reach the merits of the methodology if we decide that restitution is not appropriate here. Tr. at 51.[9] Because we conclude, for the reasons that follow below, that the plaintiff class is not entitled to restitution, we decline the invitation to address the merits of the methodology, as we are persuaded that the controversy between these plaintiffs and the federal defendants becomes moot.

## ANALYSIS

### A. *The Prevailing Wage Regulations*

As stated above, after the matter had been in litigation for some time, the government "confessed error" to Judge Weinfeld, stating in open court that it could not defend the DOL's prior determination, based on the Farmer Memorandum, that the prevailing wage regulations, specifically 20 C.F.R. § 653.501(d)(4), may be complied with by the offer of an hourly wage equal to, or higher than, the AEWR. Consequently, the DOL withdrew its determination. *See* Affidavit of Paul K. Milmed, sworn to May 15, 1987 ("Milmed Aff."), at ¶¶ 7, 9; Schaerfl 5/8/87 Aff. at ¶ 4. Because of the posture of the case, however, no consent agreement or settlement was entered into between the plaintiffs and the federal defendants. The government contends that the decision by the Department of Justice not to defend an administrative determination, and the DOL's concomitant withdrawal of that determination, are litigation decisions committed by law to the "unfettered discretion" of the Attorney General and are not reviewable under the Administrative Procedure Act (the "APA"), 5 U.S.C. § 701 *et seq.* The growers would have the Court review the change in position by the government, since they believe that the DOL's initial determination was correct. *See* Grower Defendants' Memorandum in Opposition to Government De-

---

8. Plaintiffs admit, however, that if the methodology developed and submitted by the DOL is applied by the Court, "it appears that it will result in a wage close to the $4.56 rate erroneously approved." Plaintiffs' Main Memo. at 5, n. 2.

9. The Growers add that, under the circumstances posited, the appropriate remedy would be a "rulemaking" procedure as provided by the Administrative Procedure Act. Tr. at 34–35.

fendants' Cross–Motion for Summary Judgment at 5, 8.

The Department of Justice, under the direction of the Attorney General, is vested by law with the exclusive authority, except as otherwise authorized by law, to conduct litigation on behalf of the United States, its agencies and its officers. *See* 28 U.S.C. § 516. The Department of Justice also has the power to supervise all such litigation. *See* 28 U.S.C. § 519. This grant of power has been termed "broad," *United States v. Newport News Shipbuilding and Dry Dock Co.,* 571 F.2d 1283, 1287 (4th Cir. 1978), *cert. denied,* 439 U.S. 875, 99 S.Ct. 212, 58 L.Ed.2d 189 (1978), and "plenary," *In re Ocean Shipping Antitrust Litigation,* 500 F.Supp. 1235, 1239 (S.D.N.Y. 1980), so that control of all government litigation, prosecution and defense, may be centralized and coordinated. *See I.C.C. v. Southern Railway Co.,* 543 F.2d 534, 536 (5th Cir.1976).

■ The authority to conduct and supervise government litigation extends to all aspects of the case, strategic as well as substantive. Section 5 of the Executive Order No. 6166, June 10, 1933, reprinted at 5 U.S.C. following § 701, explicitly sets out this broad authority. It provides, in pertinent part, that:

> As to any case referred to the Department of Justice for prosecution or defense in the courts, *the function of the decision whether and in what manner* to prosecute, or *to defend,* or to compromise, or to appeal, *or to abandon* prosecution or *defense,* now exercised by any agency or officer, *is transferred to the Department of Justice.*

*See id.* (emphasis added). Moreover, caselaw supports the proposition that the Department of Justice may overrule a position taken by the government agency. For example, in the *Newport News* case, the Court of Appeals for the Fourth Circuit sustained the Attorney General's authority to reject a settlement reached between the Navy and a private party. 571 F.2d at 1287–88. The Court found that it was the Attorney General, either personally or through his subordinates, who must carefully analyze the strength of the government's position and who must decide whether it should be pursued. *See id.*

■ Where an agency has absolute discretion over a particular matter, judicial review of agency action relating to that matter is not available. *Heckler v. Chaney,* 470 U.S. 821, 830, 105 S.Ct. 1649, 1655, 84 L.Ed.2d 714 (1985) (interpreting section 701(a)(2) of the APA). In this case, it is clear, from all of the affidavits and depositions submitted to the Court, that the Department of Justice disagreed with the position taken by the DOL with regard to this case. In accordance with its function of ascertaining the ultimate litigation position of the government, the Department of Justice determined that it was "not appropriate" to defend the DOL position, and the DOL subsequently withdrew the determination on which this suit is in large part based. Milmed Aff. at ¶¶ 7, 9; Schaerfl 5/8/87 Aff. at ¶ 4. Because this discretionary authority of the Justice Department is absolute, the Court agrees with the federal defendants that the decision not to defend an administrative determination, and the DOL's concomitant withdrawal of that determination,[10] are litigation decisions which are not reviewable under the Administrative Procedure Act. The Court believes, however, that plaintiffs are entitled to a judicial declaration, not just a "confession of error" by the DOL that its first determination was wrong. Accordingly, the Court holds that the DOL did not properly apply the prevailing wage regulations, 20 C.F.R. Part 653, in approving the growers' 1986 job orders.

**B.** *The Plaintiffs' Right to Restitution*

■ The question that arises out of the finding that the DOL did not properly ap-

---

**10.** There is no reason to distinguish the DOL's "decision" to withdraw the determination from the Justice Department's unreviewable "decision" not to defend the determination. The DOL had no choice but to accept Justice's "deci-sion" not to defend, and therefore, it had to withdraw the determination. Thus, the two "decisions" are, for all intents and purposes, inseparable.

ply the prevailing wage legislation is whether the plaintiffs are entitled to restitution. The plaintiffs rely on two principles in asserting their right to restitution: a) an implied private right of action to enforce alleged violations of the Wagner–Peyser Act and b) the remedy of equitable restitution.

The growers have extensively briefed both bases for relief and insist that the plaintiffs have no right to recover additional pay. Regarding the creation of an implied private right of action, their brief effectively states the argument of why no such right exists, *see* Grower Defendants' Memorandum in Opposition to Plaintiffs' Motion for Summary Judgment, and In Support of Grower Defendants' Cross–Motion for Summary Judgment ("Growers' Main Memo") at 6–13, and why one should not and cannot be created, *id.* at 14–34. The growers' argument, in condensed form, is as follows: that the statute does not expressly confer private causes of action on the plaintiffs; that although, one court, in 1969, implied a cause of action under the Act where a grower refused to abide by the terms of its job order and where the grower made misrepresentations to the workers and the state authorities, *see Gomez v. Florida State Employment Service,* 417 F.2d 569 (5th Cir.1969), the case must be limited to breach of contract and fraudulent inducement of contract cases; and that here the plaintiffs' cause of action arises out the growers' compliance with the job orders, and not their failure to abide by them, and that *Gomez* does not provide for a private right of action under these circumstances. The growers also argue (correctly) that *Gomez* would not likely be decided the same way today. The case was decided in an era where courts expansively interpreted federal statutes to imply causes of action, but since *Cort v. Ash,* 422 U.S. 66, 78, 95 S.Ct. 2080, 2087, 45 L.Ed.2d 26 (1975), and its progeny, *see, e.g., Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran,* 456 U.S. 353, 375–79, 102 S.Ct. 1825, 1837–39, 72 L.Ed.2d 182 (1982); *Universities Research Ass'n v. Coutu,* 450 U.S. 754, 771 & n. 21, 101 S.Ct. 1451, 1461 & n. 21, 67 L.Ed.2d 662 (1981); *Cannon v.*

*University of Chicago,* 441 U.S. 677, 689 & n. 9, 99 S.Ct. 1946, 1953 & n. 9, 60 L.Ed.2d 560 (1979), the jurisprudence of implied rights of action has undergone a marked shift. Pointing to the legislative history to show that Congress did not intend that the provisions of the statute be enforced through private litigation (the most important factor to be considered under *Cort*), Growers' Main Memo. at 19–24, and in light of the "unmistakable indications of the disfavor with which implied causes of action are viewed," *id.* at 19, the growers assert that this Court should not expand *Gomez* to cover claims where the grower complied with the job orders in question. We endorse this view.

In a recent case that is somewhat related to this action, Judge Richey agreed that it is questionable whether there is such a private right of action. *Frederick County Fruit Growers Assoc., Inc. v. McLaughlin,* 703 F.Supp. 1021, 1029–30 n. 17 (D.D.C. 1989), *clarified,* 709 F.Supp. 242 (D.D.C. 1989) (available on Westlaw, 1989 WL 25445) (*comparing Gomez v. Florida State Employment Service,* 417 F.2d 569 (5th Cir.1969) *with DeLaFuente v. Stokely–VanCamp, Inc.,* 514 F.Supp. 68 (C.D.Ill. 1981), *aff'd on other grounds,* 713 F.2d 225 (7th Cir.1983)). Furthermore, Judge Richey rejected the remedy for the workers, stating that "in light of the fact that the Growers ... were acting in accordance with DOL's interpretation of applicable law, the Court is unwilling to find that the Growers violated either a statutory or regulatory scheme...." *See id.* As to the facts of the instant case, this statement is entirely appropos as well as very persuasive, and together with the extensive briefing by the growers, it is clear that restitution should not be granted to the plaintiffs on the basis of an implied right of action.

The *Frederick County* case is also highly relevant with respect to the equitable restitution remedy, the second basis for relief claimed by the plaintiff class. There, Judge Richey found that the workers were entitled to restitution for certain years and not for others. The plaintiffs argue, in a

recent supplemental submission, that the Court should follow *Frederick County* and find that restitution is an available remedy and that it is proper in this case. Although the growers did not respond in writing to the arguments put forth by plaintiff in light of the *Frederick County* case, they did address them at the oral argument.

The growers maintain that the *Frederick County* case is distinguishable in many ways. First, they point out that Judge Richey did not give restitution for all of the years requested. They, of course, argue that this case more closely resembles the situation in 1984 for which no restitution was granted, while the plaintiffs assert that the facts are more analogous to the 1983 situation when restitution was granted. In 1984, no back pay was awarded because the DOL rule in question had been upheld (by the courts) as valid, so at the time, the Growers had no reason to believe that they were acting improperly, and they had every reason to believe that they were in compliance with the law. *Frederick County*, 703 F.Supp. at 1029. The growers state that this reasoning is directly applicable to their situation here. At the time in 1986, the law in effect, as interpreted by the DOL, did not require payment of a wage higher than that offered in the job orders cleared through the system. Therefore, the growers argue, they should not be penalized for following the law in effect at the time.

As regards the similarity of the 1983 situation, the plaintiffs have argued that what they call the "critical" factors cited by Judge Richey—knowledge that their DOL-approved wage might be found invalid and notice of a claim for restitution—are very clearly satisfied in this case. The growers responded that the first "critical" factor is misstated by the plaintiffs; it is not knowledge that the regulation *might* be declared invalid, but in *Frederick County* the regulation was, *in fact*, declared invalid by the District Court. Thus, they say that the 1983 situation is distinguishable since the back pay was awarded only because there was an actual court order enjoining the DOL from giving effect to the rule which thus cast a very long shad-

ow on the validity of the regulation in issue there. They argue that the job orders in the instant case were not of the same "dubious validity," 703 F.Supp. at 1029, since Judge Weinfeld did *not* grant the workers the preliminary injunctive relief requested. While this Court does not agree with the counsel for the growers that there needs to be "an injunction in the air [in order] to reach the concept of equitable restitution" Tr. at 45, the Court does acknowledge that the growers' argument regarding the fact that no injunction was granted is influential as to which way this factor weighs. In fact, in his March 20, 1989 Order clarifying the judgment of the Court of January 17, 1989, Judge Richey stated that "the very basis of this Court's holding as to 1983 was that the Growers' decisions to pay the unlawful rates were made in knowing violation of this Court's Order of September 8, 1983." *Frederick County Fruit Growers Assoc., Inc. v. McLaughlin*, 709 F.Supp. 242, 247 (D.D.C.1989). Accordingly, the Growers have the better position on this issue of knowledge.

As to what the plaintiffs have denominated the second "critical" factor, notice of the claim for restitution, plaintiffs point out that Judge Weinfeld, in denying their request for preliminary injunctive relief, stated that "[w]hen defendants hired migrant workers at flat hourly rates they did so with knowledge that this Court might find DOL's approval void and impose an award of back pay." Plaintiffs' Supplemental Brief at 4 (*quoting* Order entered October 10, 1986). However, plaintiffs conveniently leave out the context in which this statement was expressed.

That context indicates that these remarks were not intended to dispose of the issue of the growers' reliance on the DOL's determinations. The plaintiffs, having failed in their attempt to enjoin the growers from offering the DOL-approved rate to H-2 workers without a notice that the rate was being challenged in court, sought preliminary injunctive relief to preclude the growers from raising what they called the "estoppel" defense (which was founded

upon the growers' reliance on DOL's prior advice and determinations). Judge Weinfeld denied this request, noting that the plaintiffs were seeking a "partial decision on the merits in the guise of preliminary relief." Order entered October 10, 1986, at 3. We read Judge Weinfeld's Order as concluding that the filing of the complaint had put the growers on notice that *henceforth* they could not proceed in blind reliance on the DOL's determination in hiring the H–2 workers; that there was a possibility that the Court might impose a back-pay award; and that it would consider the estoppel argument on its merits at the appropriate time. As will be discussed more extensively below, the growers have a very strong reliance argument, and accordingly, an award of restitution is not justified under the circumstances.

Apart from distinguishing the facts of the *Frederick County* case, the growers have criticized and attempted to undercut the reasoning underlying the *Frederick County* court's grant of restitution.[11] Essentially, they argue that the remedy of restitution is not available to the plaintiff class and that the cases that Judge Richey relied on for the principle that restitution was appropriate, namely *Democratic Central Comm. of D.C. v. Wash. Metrop. Area Transit Comm.*, 485 F.2d 786 (D.C.Cir. 1973), *cert. denied*, 415 U.S. 935, 94 S.Ct. 1451, 39 L.Ed.2d 493 (1974), and *Williams v. Wash. Metrop. Area Transit Comm.*, 415 F.2d 922 (D.C.Cir.1968), *cert. denied*, 393 U.S. 1081, 89 S.Ct. 860, 21 L.Ed.2d 773 (1969), are flawed.

■ Contrary to what the growers argue, these cases do not support the proposition that restitution is unavailable as a remedy in the instant case. Restitution is available at the discretion of the court where the equities so warrant, despite the absence of a statute or contract providing therefor. 50 N.Y.Jur., *Restitution*, § 1 at 129–31. The cases cited by the growers, however, do add persuasive factors[12] as to why restitution is not appropriate in the instant case[13] and will be discussed at greater length below. *See infra*, 26–29. As the decision of whether to grant restitution is discretionary, reimbursement of funds will be required " 'only to the extent that justice between the parties requires.' " *Frederick County*, 703 F.Supp. at 1029 (citation omitted). Equity will require such a result "only when the money was obtained in such circumstances that the possessor will give offense to equity and good

---

11. The Court stated that the legal principle underlying its decision is that "when funds have been either paid or withheld pursuant to an invalid administrative edict, the proper remedy is equitable restitution." *Frederick County*, 703 F.Supp. at 1029.

12. Briefly, the growers state that the cases that the District Court for the District of Columbia relied on were District of Columbia circuit court cases which have no counterpart, and have never been relied on, in the Second Circuit. In addition, they assert that the *Frederick County* court mistakenly relied on those District of Columbia Circuit cases and attempt to distinguish their facts. They point out that the District of Columbia cases, which concerned utilities and common carriers, all involved a statutory refund power, as well as industries whose members are given no option to participate or not to participate in the legislatively created ratemaking procedure if they wish to conduct the business of the industry. They contend that the instant case is different in that it is not mandatory to participate in the H–2 program; a grower can still harvest apples but it will simply not be allowed to hire temporary foreign workers. They further point out that the Wagner–Peyser Act does not give the DOL the power to give

refunds or make restitution, and that the government concedes (and the plaintiffs reluctantly admit, *see infra* at 23–24) that it has no power to order the growers to pay additional compensation to plaintiffs. *See* Growers Main Memo at 42. Moreover, the growers submit that in the District of Columbia cases, the regulatory agency does not select or set the rates but it is the industry participant who does so. In their own case, the DOL is the one who computes the appropriate minimum permissible wage rate, and that this distinction is dispositive in light of the *Arizona Grocery Co. v. Atchison, Topeka & Santa Fe Railway*, 284 U.S. 370, 52 S.Ct. 183, 76 L.Ed. 348 (1932), line of cases. *See* Growers Main Memorandum at 45–48. Finally on this point, the growers assert that the regulatory schemes and procedural rights involved in the utility or common carrier cases are sufficiently different from the Wagner–Peyser Act to preclude any analogy to them here.

13. The growers have also argued that even if the court decides to follow the *Frederick County* case and finds that the remedy of restitution is permitted, the equities here do not demand it.

conscience if permitted to retain it." *See id.* (citation omitted).

In pondering the equities of the situation, the weightiest factor for the Court's consideration is whether the growers relied on the approval by the DOL and whether such reliance was reasonable. The plaintiffs argue that the growers did not rely at all on the approval of the job clearance orders by the DOL, and even if they did rely, such reliance was neither reasonable nor to their detriment. The argument that the growers did not rely at all can be easily eliminated. As Judge Turk of the Western District of Virginia stated in a case before him also involving the controversy over the 1986 harvest, "[i]t would belie common sense to conclude that the Growers, as businessmen, did not at least substantially rely on that approval in formulating their harvest plans." *Donaldson v. DOL,* No. 86-C-0088(R), slip op. at 13, 1988 WL 156803 (W.D.Va. Aug. 12, 1988), *appeal filed,* No. 88-2920 (4th Cir.1988).

The main basis for the plaintiff's contention that even if the growers relied, such reliance was not reasonable, is the "fact" that the growers were put on "notice" prior to the harvest season that the wage rate offered was being challenged and might be declared unlawful. This argument, however, does not properly take into account the timing of both the approval and the institution of the lawsuit. The growers submitted their job clearance orders in May of 1986. These job orders were premised on the Farmer Memorandum which was issued in the same month after what appeared to the growers to be a reasonable internal evaluation and analysis by the DOL. Plaintiffs' counsel were made specifically aware of the Farmer Memorandum at this time. *See* Growers' Main Memo. at 72. Furthermore, the DOL approvals were made a matter of public record once the job orders were circulated through the system. Plaintiffs filed this suit in late August 1986, just days prior to the commencement of the harvest season. Up until this point, the Growers were entitled to rely on the DOL's approval as valid because the law presumes that an administrative agency will exercise its statutory duties in a lawful

manner. *See F.C.C. v. Schreiber,* 381 U.S. 279, 296, 85 S.Ct. 1459, 1470, 14 L.Ed.2d 383 (1965); *Blinder v. Securities Exch. Comm'n.,* 748 F.2d 1415, 1418 (10th Cir. 1984), *cert. denied,* 471 U.S. 1125, 105 S.Ct. 2655, 86 L.Ed.2d 272 (1985); *Rosati v. Haran,* 459 F.Supp. 1148, 1159 (E.D.N.Y.1977). In the related case of *Donaldson v. DOL,* Judge Turk, on almost identical facts, found that the Growers had every right to rely on the wage rate approved by the DOL, *Donaldson v. DOL,* No. 86-C-0088(R), slip op. at 11-12, 1988 WL 156803 (W.D.Va. Aug. 12, 1988), thus denying the plaintiffs' request for restitution.

The question then arises whether the growers reasonably relied on the DOL's approvals *after* the institution of this action. The growers argue that the "notice" provided by the lawsuit really was not notice at all because at that point, on the eve of the harvest, their plans were irrevocably made. The affidavits of one of the growers, Joseph Russo, (who is also an officer of one of the Growers' Associations) state that the approved wage rate played a central part in their economic planning for the harvest season. Mr. Russo pointed out that labor is the largest component of the costs incurred by apple growers. *See* Affidavit of Joseph Russo, sworn to on September 11, 1986, at ¶ 10 ("Russo 9/11/87 Aff."). He further specified that harvest labor comprises 35-40 percent of the total labor costs. *See id.* Therefore, if the Growers had known in May of 1986 that they would have had to pay a different, higher rate, they might have sought to hire fewer workers, taken acreage of older trees out of production, or even sold land. *See* Affidavit of Joseph Russo, sworn to on Dec. 30, 1987, at ¶ 13 ("Russo 12/30/87 Aff."). However, when this suit was filed in late August of 1986, the Growers were foreclosed from any feasible economic option other than letting the fruit go unpicked and left to rot because the cost of harvesting the fruit would not be covered by the price the fruit would bring. *See id.* Indeed, it is likely that, in late August, some of the foreign migrant workers had

already started their journey to New York as the harvest season usually begins just before or after September 1.[14] Also of great importance is the fact that, at this late date, the growers did not have the option of paying the "proportional" or "Richey" piece rate even if they wanted to because there was no longer time to circulate piece rate job orders as required by the applicable DOL regulations. *See* Russo 12/30/87 Aff. at ¶ 14.[15] Thus, in light of all of the above, the growers have shown that they had no alternative but to go forward with the hiring of the H–2 workers at the rate approved in their job orders.

The next issue for consideration is whether the growers relied to their detriment on the DOL approvals. It is clear that had the Growers not relied on the DOL approvals, which had been based on DOL policy that both the prevailing wage and the adverse effect wage regulations would be satisfied by a flat hourly rate offer of a rate equal or higher than the AEWR, they would not be parties to this protracted and no-doubt costly class action lawsuit. If DOL had rejected the growers' offers to pay an hourly rate at that time, the growers that still desired to hire foreign workers for the 1986 harvest season would have had no choice but to pay whatever rate (i.e. the proportional piece rate) was set by the DOL. This line of reasoning leads directly to the conclusion that the growers might now be compelled to pay "incentive" level wages for "non-incentive" level output because they relied on the DOL approvals for the 1986 harvest. *See* Growers' Main Memo. at 73. The hourly wage method of salary is a non-incentive method; the piece-rate wage is an incentive method. Use of a piece-rate results in increased productivity over the use of an hourly wage. The workers were paid at the hourly wage, and therefore, it is arguable, if not probable, that they worked at a slower and more relaxed pace, and consequently, produced less than they would have had they been paid on a piece-rate method. A grower paying the proportional piece rate would have been assured of receiving a commensurate level of productivity. Accordingly, it is clear that the growers relied to their detriment on the DOL approvals. In this light, this Court finds that, at this time, it would be prejudicial and inequitable to compel them to pay the workers a rate equivalent to piece-rate hourly earnings (as the plaintiffs would have it).

Lending further support to the growers' argument that restitution should not be granted is the analogy to the "reliance" defense utilized in criminal actions. This defense, as set out in the Model Penal Code § 2.04(3)(b) (A.L.I.1985), arises where an individual acts in reasonable reliance upon an official statement of the law, such as a statute or an official interpretation by the public officer or body charged by law with responsibility for the interpretation of the law or statute in question, and the statement is later determined to be invalid or erroneous. While the defense was clearly designed for use in criminal actions, it has also been employed in civil actions. *See, e.g., Kratz v. Kratz,* 477 F.Supp. 463, 482–83 (E.D.Pa.1979) (holding defense of reasonable reliance on official statement available in civil case). The purposes behind the criminal defense—to foster a public policy of rewarding "those who seek out the re-

---

**14.** In their statement pursuant to Local Rule 3(g) of the Southern and Eastern Districts of New York, the growers state that by the time this action was commenced, "many H–2 workers were already in transit to New York or had in fact begun to work in New York pursuant to [the approved] job orders." Grower Defendants' Local Rule 3(g) Statement at ¶ 12. The plaintiffs dispute this statement. Plaintiffs' Response to Grower Defendants 3(g) Statement, I, 7: II, 12. The Court finds that a reasonable jury could only conclude that some, if not most, workers had already made preparations to come to New York and were in the process of getting here. Therefore, this fact (which, in any event, is not material to the Court's overall finding of reliance) does not preclude the grant of summary judgment.

**15.** It should be noted that Judge Weinfeld declined the plaintiffs' request to have the job orders amended to add a notice that the offered wage was being challenged in court. Nor did he issue an order mandating that the job orders be deemed amended to state that the growers would pay whatever the Court subsequently determined to be the prevailing wage.

quirements of the law and attempt to conform their conduct to those requirements," (*id.* at 480)—are similarly promoted by the application of the defense in this civil case. What is more, in a civil case involving an agency determination, the court, after referring to the reliance defense in the criminal sphere, recognized that "[i]n the civil context as well, there are cases supporting the proposition that an agency may not impose liability retroactively when the individual has acted in accordance with the agency's own announced interpretation of the statute." *International Union, United Auto., Aero. & Agric. Implement Workers of America v. Brock,* 783 F.2d 237, 248 (D.C.Cir.1986) (footnote and citations omitted). As set out below, *see infra* at 675–76, the DOL has no power to impose restitution or back pay awards here. Even though the plaintiff seeks restitution by court order rather than by agency directive, the above-quoted authority still has significant bearing upon this litigation.

In determining whether restitution is appropriate, this Court must also balance the hardships to all of the parties. Other factors, aside from the reliance component discussed immediately above, also weigh in favor of the growers. They are: the role of the DOL in setting the rates, the timing of the action, the absence of a statutory refund power, and the lack of bad faith.

The role of the DOL in the overall regulatory scheme, and in this case, weighs against an award of restitution. It is the DOL's responsibility to compute the appropriate minimum wage under the regulations. Thus, the wage rate was set by the DOL, not by the growers. Furthermore, the DOL will not process a job order that does not offer at least the appropriate minimum wage along with all of the other minimum required terms and conditions of employment. 20 C.F.R. § 655.204(c). Accordingly, as cogently stated by Judge Richey in his first published decision relating to the regulation of compensation of migrant farmworkers, where he refused to order additional pay for previous years (1980 and 1981) because to so do was not in accord with equity and good conscience, "[a]lthough the growers have exhibited far less than generosity toward their workers and have attempted to stretch the law to its limits, it was the action of the ... DOL in *mis* interpreting the bounds of the law that caused the problem here. The growers should not be forced to bear the cost." *NAACP v. Donovan,* 558 F.Supp. 218 (D.D.C.1982) (emphasis in original).[16] This language is entirely apposite to the situation at hand.

In addition, the timing of the suit, as discussed above, prevented the growers from adopting certain alternatives that might have been available had the suit been commenced earlier. As a result of this delay, the growers took actions which irrevocably committed them to cultivating their crop and harvesting it with the help of H–2 workers.

Furthermore, the statute does not explicitly mandate that restitution be granted, a fact the plaintiffs reluctantly admit. *See* Plaintiffs' Reply Memo. at 34 ("DOL has *implicit* authority to grant restitution....") (emphasis supplied). The growers maintain that this absence of a statutory "refund" power is dispositive here; that unless the remedy is provided to the administrative agency, restitution is not appropriate. Under the Wagner–Peyser Act, the DOL's sole remedial power for a violation of the H–2 Program regulations (adverse effect regulations) is to exclude the grower from participation in the program for one year. 20 C.F.R. § 655.210(a) and (b). Part 658 of the regulations does refer to restitution, but a reading of the regulation indicates that it is purely voluntary and not compulsory. It would be applicable when a grower has been excluded from the program and wishes to be reinstated for the coming year. In that event, the grower may choose to make restitution to the workers for the violation in lieu of exclusion from the program. *See* 20 C.F.R.

---

**16.** This action only applied to growers in West Virginia and was not appealed. It was subsequently expanded to encompass states other than West Virginia. *NAACP v. Donovan,* 566 F.Supp. 1202 (D.D.C.1983). For a full history of the *NAACP* litigation, attention is directed to *Frederick County,* 703 F.Supp. 1021, 1023–28 and Appendix (D.D.C.1989).

§§ 658.501(c) and 658.504(a)(2)(ii). Thus, the fact that DOL does not have the power to order restitution is certainly a factor which weighs in the growers' favor here.

Moreover, plaintiffs ask the court to consider an argument akin to the "clean hands" doctrine. They state that the defendants chose to pay the hourly wage rate to avoid the higher "Richey piece rate" and as such should be penalized for what they call the rate's unlawfulness. This argument ignores the fact that the plaintiffs admit (as does the government) that there is nothing in either of the applicable DOL regulations which precludes the growers from offering an hourly wage even though the prevailing wage in the past had been a piece rate. *See also* 20 C.F.R. § 653.501(d)(4). The growers have the right to select the method of pay. Thus, there is no reason to hold the purely economic strategy of selecting an hourly rate in return for reduced productivity against the growers. Furthermore, despite plaintiffs' claims to the contrary, there is nothing in the record which suggests that when the job orders were approved by the DOL, the growers believed that the prevailing wage regulation was not properly applied. Accordingly, the Court rejects the plaintiffs' bad faith or "unclean hands" argument.

Finally, plaintiffs ask the court to consider the public interest in seeing that restitution is granted. They state that the "[u]nderpaying [of the] workers cannot help but depress the wages of farmworkers throughout New York. Requiring restitution would off-set that depressive effect and thus protect the public interest." Plaintiffs' Main Memo. at 44. First, this argument does not take into account the one-time nature of the mistake made here. The government has stated its intention of complying with the prevailing wage legislation in the future, and there is nothing in the record that indicates that it will not. Second, this argument is speculative because plaintiffs have not shown that the wages were indeed depressed in 1987 as a result of the erroneous wage rate approvals in 1986, or that they will be depressed in the future. Last, public policy may actually constitute a bar to restitution because of a need to protect the growers who relied on what was, at the time, a presumptively lawful agency determination. *See* Restatement of Restitution § 62 and comment a, at 241; *see also supra,* at 674 (discussion of public policy behind reliance defense). Therefore, this factor does not weigh in the plaintiffs' favor.

Accordingly, for all of the foregoing reasons, this Court finds that while restitution is a possible remedy, such relief should not be granted to the plaintiffs here because the equities do not require it. As the Court declines to decide the question of the soundness of the methodology because there no longer exists a controversy between the plaintiff class and the federal defendants, summary judgment in favor of the defendant class of growers is granted in part and denied in part, the cross-motion of the plaintiff class of workers is denied, and the cross-motion of the federal defendants is granted in part and denied in part. The Court also denies plaintiffs' motion to amend the complaint to add claims under the Migrant and Seasonal Agricultural Worker Protection Act, 29 U.S.C. §§ 1801–1872. *See Donaldson v. DOL,* No. 86–C–0088(R), slip op. at 7–8, 1988 WL 156803 (W.D.Va. Aug. 12, 1988).

In summary, this Court holds that the plaintiffs' complaint no longer states a claim for relief against the Immigration and Naturalization Service; that the Department of Labor did not properly apply the prevailing wage regulations in approving the growers' 1986 job orders; that growers are not liable to the plaintiffs for restitution despite the conclusion that the prevailing wage regulations were not properly applied; and that the controversy between these plaintiffs and the federal defendants as to the validity of the methodology developed on remand is moot. Consequently, the complaint herein is dismissed and the Clerk of the Court is directed to enter judgment in accordance with the aforesaid findings.

SO ORDERED.